NEW ENERGY COMPANY OF INDIANA, APPELLANT, *v.* LIMBACH, TAX
COMMR., ET AL., APPELLEES.

[Cite as New Energy Co. of Indiana *v.* Limbach (1987), 32 Ohio St. 3d 206.]

(No. 86-784—Decided September 2, 1987.)

Murphey, Young & Smith Co.,
L.P.A., David J. Young, Kevin R.

*McDermott* and *Herman Schwartz,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Richard C. Farrin,* for appellees Tax Commissioner and Treasurer of State.

*Jones, Day, Reavis & Pogue* and *David C. Crago,* for appellee South Point Ethanol.

*Patricia M. Wilson,* urging reversal for *amicus curiae,* Marathon Petroleum Co.

GREY, J. A state may enact valid legislation which promotes some local interest, and which affects interstate commerce within its borders, but it may not discriminate against interstate commerce or impose unreasonable restrictions on it. The problem in almost all of these kinds of cases is in deciding where to draw the line. In *Boston Stock Exchange* v. *State Tax Comm.* (1977), 429 U.S. 318, the United States Supreme Court in discussing the Commerce Clause stated, at 329:

"* * * the Clause is a limit on state power. Defining that limit has been a continuing task of this Court."

Commerce Clause cases generally involve four types of cases and problems: those directly barring out-of-state goods; those favoring local business over out-of-state goods; those which have the practical effect of barring out-of-state goods; and those which 'force reciprocity on sister states.

Cases of an outright bar on out-of-state goods are rare, and inapplicable here since R.C. 5735.145 does not bar ethanol produced outside the state.

An issue is presented, however, on whether the statute favors in-state producers, *i.e.,* whether it is a form of economic protectionism. The Supreme Court has regularly and consistently struck down state laws which have as their purpose the protection of local economic interests. In *Baldwin* v. *G.A.F. Seelig, Inc.* (1935), 294 U.S. 511, New York enacted a statute which prohibited the sale of milk produced out of state unless it was sold there at the minimum price set by New York. Seelig, Inc. bought milk in Vermont at a lower price and shipped it to New York, but was threatened with prosecution for violation of the New York statute. The United States Supreme Court struck down the statute, holding that its only purpose was to protect New York milk producers from out-of-state price competition.

In *Hunt* v. *Washington State Apple Advertising Comm.* (1977), 432 U.S. 333, a similar protectionist statute was voided. Washington had a system of inspecting and grading its apples, equivalent of, or superior to, the federal grades and standards. North Carolina enacted a law which prohibited the sale of apples in containers using the Washington grading system. Under the North Carolina statute apples could be identified only by the federal grade or standard. The clear intent of the statute was to protect North Carolina apple growers from the heavily advertised Washington apple logo, and its reputation for quality. Again, the Supreme Court struck down this attempt at economic protectionism.

R.C. 5735.145 is not protectionist in either its purpose or effect. The tax credit is available to all producers, those in-state and those in states outside Ohio which provide a reciprocal tax credit. To be sure, appellant New Energy is adversely affected by Ohio tax credit policy, but mere adverse effect on the business of one competitor is not sufficient to have a valid statute declared unconstitutional. *Minnesota* v. *Clover Leaf Creamery Co.* (1981), 449 U.S. 456, and *Exxon Corp.* v. *Governor of Maryland* (1978), 437 U.S.

117, are representative of the Supreme Court's decisions.

In *Exxon,* Maryland enacted a statute which prohibited a producer or refiner of petroleum products from also operating retail gas stations. The Maryland Legislature felt that during the 1973 oil shortage the refiners favored the company-owned stations over independent retailers. Exxon sued claiming the statute was a burden on interstate companies who were being forced to divest themselves of their retail operations. The Supreme Court disagreed, and pointed out that in-state independent dealers would have no competitive advantage over out-of-state dealers.

The court made the point succinctly:

"If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market — as in *Hunt,* 432 U.S., at 347, and *Dean Milk* [v. *Madison* (1951)], 340 U.S., at 354, — the regulation may have a discriminatory effect on interstate commerce. But the Maryland statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods. The sales by independent retailers are just as much a part of the flow of interstate commerce as the sales made by the refiner-operated stations." *Id.* at 126, fn. 16.

In *Clover Leaf Creamery Co.,* the United States Supreme Court cited and followed *Exxon,* at 474:

"In *Exxon Corp.* v. *Governor of Maryland,* 437 U.S. 117 (1978), we upheld a Maryland statute barring producers and refiners of petroleum products — all of which were out-of-state businesses — from retailing gasoline in the State. We stressed that the Commerce Clause 'protects the interstate market, not particularly interstate firms, from prohibitive or burdensome regulations.' *Id.,* at 127-128. A non-discriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominately out-of-state industry to a predominately in-state industry. Only if the burden on interstate commerce clearly outweighs the State's legitimate purpose does such a regulation violate the Commerce Clause."

In *Clover Leaf Creamery Co.* the state of Minnesota adopted a law banning the sale of milk in nonreturnable, nonrefillable plastic containers, *i.e.,* the ubiquitous gallon jug. The debate in the legislature centered around which container, plastic or paper, was the more environmentally sound. The Minnesota Supreme Court in holding the statute to be unconstitutional, found, "* * * in effect, that the legislature misunderstood the facts." *Id.* at 469.

This same point is raised by New Energy, and by *amicus* Marathon, *i.e.,* that Ohio's ethanol tax credit program is not founded on a rational and legitimate state interest. Both conceded that removing lead from gasoline, and thus from the environment, is a desirable health goal, but urge that ethanol is not the only solution. This argument is put clearly by Marathon:

"Quite simply, it is Marathon's position that if today no consensus has yet been reached within the industry as to the health aspects of ethanol, it is implausible to say that the Ohio legislature arrived at such a consensus when it enacted the general ethanol subsidization statute, R.C. 5735.145."

We believe that Marathon and appellant make the same mistake that was made by the Minnesota Supreme

Court. The United States Supreme Court noted, in *Clover Leaf Creamery Co.,* at 469:

"The Minnesota Supreme Court may be correct that the Act is not a sensible means of conserving energy. But we reiterate that 'it is up to legislatures, not courts, to decide on the wisdom and utility of legislation.' *Ferguson* v. *Skrupa,* 372 U.S. 726, 729 (1963)."

This court makes no decision on the wisdom of R.C. 5735.145, but we do find that its enactment is rationally related to a legitimate state interest. The statute is not "simply protectionism," *Philadelphia* v. *New Jersey* (1978), 437 U.S. 617, and is not void on that ground.

A most recent case is *CTS Corp.* v. *Dynamics Corp. of America* (1987), 481 U.S. ____, 95 L. Ed. 2d 67. In *CTS,* Indiana enacted a statute to protect the shareholders of Indiana corporations from hostile tender offers. While this case is not directly on point, it does demonstrate the United States Supreme Court's consistent position on evenhandedness, at 84:

"Dynamics nevertheless contends that the statute is discriminatory because it will apply most often to out-of-state entities. This argument rests on the contention that, as a practical matter, most hostile tender offers are launched by offerors outside Indiana. But this argument avails Dynamics little. 'The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.' *Exxon Corp.* v. *Governor of Maryland,* 437 U.S. 117, 126 * * * (1978). See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 471-472 * * * (1981) (rejecting a claim of discrimination because the challenged statute 'regulate[d] evenhandedly * * * without regard to whether the [commerce came] from outside the State'); *Commonwealth Edison Co.* v. *Montana,* 453 U.S. 609, 619 * * * (1981) (rejecting a claim of discrimination because the 'tax burden [was] borne according to the amount * * * consumed and not according to any distinction between in-state and out-of-state consumers'). Because nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors, we reject the contention that the Act discriminates against interstate commerce."

Using this same standard we find that R.C. 5735.145 is not protectionist and is not unreasonably burdensome on interstate commerce. It does not give an advantage solely to Ohio producers, and does not interfere with the flow of ethanol into Ohio by out-of-state suppliers.

This can best be shown by considering, hypothetically, what the result would be if Ohio had no ethanol producer. Producers in the states with a reciprocal tax credit program would ship ethanol into Ohio and receive the statutory tax credit. Producers from states without a reciprocal program would, as appellant, still be at a disadvantage. There would be no burden on interstate commerce *per se,* but only on *some companies* in interstate commerce. This is not unconstitutional. *Exxon, supra; Clover Leaf Creamery Co., supra.*

Now let us hypothecate that an Ohio ethanol producer comes into the market. What would the status of that Ohio producer be vis-a-vis the other companies in the interstate ethanol business? The new Ohio company would receive the tax credit, and a reciprocal tax credit for its sales in other states. This new Ohio producer would be in a position identical to the other interstate reciprocal producers.

Identity of treatment for in-state and out-of-state producers is the very essence of the Supreme Court's standard of "evenhandedness."

Simply put, R.C. 5735.145 is neither protectionist nor unreasonably burdensome on interstate commerce.

The issue of forced reciprocity, however, presents this court with a thorny problem. State statutes which are facially discriminatory must be subject to the "strictest scrutiny," *Hughes* v. *Oklahoma* (1979), 441 U.S. 322, and state statutes forcing reciprocal action by other states are also subject to that kind of scrutiny, *Sporhase* v. *Nebraska, ex rel. Douglas* (1982), 458 U.S. 941.

The problem with forced reciprocity is that inquiry must always begin by determining who is forcing whom. About thirty states allow tax credits for gasohol. Most of the states near Ohio have reciprocal tax credit programs, as did Indiana until recently when it adopted a direct subsidy program. New Energy, an Indiana producer located a mere one hundred miles from the Ohio market, now claims that Ohio's reciprocal tax feature is a burden on interstate commerce, and that it cannot compete in the Ohio market. If New Energy is successful here, R.C. 5735.145(B) will be repealed. In that event, appellee South Point will not be entitled to a tax credit across the Ohio River in Kentucky. South Point would then have a cause of action against Kentucky and its ethanol producers to enjoin them from granting a tax credit. The Kentucky producers would have a cause of action against neighboring states, and so on, until each state's reciprocal tax credit program would fall like a row of dominos.

There is no question that the sovereign state of Indiana has every right to switch from a reciprocal tax credit program to a direct producer subsidy program. If Indiana has determined that a subsidy program is more beneficial for that state, so be it. If because of this policy change an Indiana ethanol producer is put at a disadvantage in maintaining its share of the Ohio market, so be that, too. But a change in one state's policy, or a loss of a company's market share, is simply not a constitutional issue.

It should be remembered that the bulk of ethanol and gasohol sold in Ohio is obtained primarily through interstate commerce, whereby ethanol is shipped into Ohio from Illinois and Tennessee. Thus, New Energy's inability to compete in the Ohio market will not affect the flow of ethanol through interstate commerce into Ohio gas stations.

Contrast this situation with *Hughes, supra,* where Oklahoma banned the shipment of minnows out of state. It was a complete ban; Oklahoma minnows were not allowed entry into interstate commerce. The United States Supreme Court found that preserving wildlife is an important state concern, but noted that the statute did not limit the number of minnows caught but only their sale outside the state. This was described as a discriminatory alternative, most burdensome on interstate commerce. There is no outright ban on interstate commerce under R.C. 5735.145. In practical effect, since Ohio's need for ethanol far exceeds the production capacity of its sole in-state producer, the reciprocal tax credit program encourages out-of-state producers to sell in Ohio. Interstate commerce is encouraged, and Ohio's interest in reducing lead pollution is promoted.

In *Sporhase, supra,* a landowner had property which straddled the Nebraska-Colorado state line. A well located on the Nebraska side was used

to irrigate some of the Colorado land. Nebraska had a statute which prohibited the transport of ground water out of Nebraska into any state which did not reciprocally allow its water to be transported into Nebraska. Colorado had no such reciprocal statute.

The *Sporhase* decision begins by pointing out the important state interest in regulating ground water, particularly in the semi-arid western states, for conservation, equitable apportionment, and the health of the citizenry. The court found, however, that the Nebraska statute was a complete bar to interstate commerce, and not related to those legitimate state interests:

"The reciprocity requirement fails to clear this initial hurdle. For there is no evidence that this restriction is narrowly tailored to the conservation and preservation rationale. Even though the supply of water in a particular well may be abundant, or perhaps even excessive, and even though the most beneficial use of that water might be in another State, such water may not be shipped into a neighboring State that does not permit its water to be used in Nebraska." *Id.* at 957-958.

In a similar vein, in *Dean Milk Co. v. Madison* (1951), 340 U.S. 349, the United States Supreme Court struck down a complete bar to interstate commerce.

In *Great A & P Tea Co. v. Cottrell* (1976), 424 U.S. 366, the court followed the "practical effect" concept, *i.e.,* although couched in the language of establishing sanitary standards, the Mississippi regulations had the effect of barring out-of-state milk. The court looked past the supposed health standards and found that the regulation was designed to bar milk, good milk or bad, from non-reciprocating states.

In short, in *Hughes, supra,* no minnows left Oklahoma. In *Sporhase,* no water was transported into Colorado. In *Great A & P Tea Co.,* no Louisana milk entered Mississippi. We do not have that kind of situation here. There is no bar, direct or indirect, on interstate commerce.

We conclude by pointing out the specific relief sought by appellant here—a permanent injunction against the state of Ohio from implementing or enforcing R.C. 5735.145. Ohio has elected to promote the use of gasohol by granting a tax credit to Ohio producers of ethanol. Ohio has extended that tax credit to all interstate producers of ethanol who grant a tax credit to Ohio producers. The reciprocal tax credits promote the sale of Ohio ethanol outside the state, and encourage the shipment of ethanol into Ohio; yet, appellant would have us enjoin this as a burden on interstate commerce.

We iterate the maxim in *Exxon*—the Constitution protects commerce, not companies.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

HOLMES, DOUGLAS and WRIGHT, JJ., concur.

SWEENEY, Acting C.J., LOCHER and H. BROWN, JJ., dissent.

SWEENEY, J., sitting for MOYER, C.J.

GREY, J., of the Fourth Appellate District, sitting for SWEENEY, J.

HERBERT R. BROWN, J., dissenting. I respectfully dissent. In my view, R.C. 5735.145(B) impermissibly discriminates against interstate commerce, as was properly recognized by this court on the first hearing of this case.

## I

Section 8, Article I of the Constitution of the United States provides that "[t]he Congress shall have Power * * * to regulate Commerce with Foreign Nations, and among the several States * * *." The United States Supreme Court has explained that "the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States * * *. * * *[T]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States." *Freeman* v. *Hewit* (1946), 329 U.S. 249, 252.

Although the power to lay taxes upon interstate commerce is reserved to the states, a state exercising this power must respect the national interest in free and open interstate trade. "No State, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce * * * by providing a direct commercial advantage to local business.' " *Boston Stock Exchange* v. *State Tax Comm.* (1977), 429 U.S. 318, 329 (quoting *Northwestern States Portland Cement Co.* v. *Minnesota* [1959], 358 U.S. 450, 458). "The Commerce Clause forbids discrimination, whether forthright or ingenious." *Best & Co., Inc.* v. *Maxwell* (1940), 311 U.S. 454, 455.

A legitimate legislative purpose does not save a discriminatory statute. As the Supreme Court has made clear: " '[W]hatever [a State's] ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently.' " *Hughes* v. *Oklahoma*

(1979), 441 U.S. 322, 337, at fn. 17 (quoting *Philadelphia* v. *New Jersey* [1978], 437 U.S. 617, 626-627).

It is against this constitutional standard that R.C. 5735.145(B) must be measured, and against which it cannot be upheld.

## II

Ohio law requires motor vehicle fuel dealers to pay taxes on all motor vehicle fuel sold, used or distributed in Ohio. See R.C. 5735.05, 5735.25 and 5735.29. As originally enacted in 1981, R.C. 5735.145 granted a credit to dealers against such taxes with respect to fuel containing a blend of not more than ten percent by volume of ethanol, *without regard to where the ethanol was produced.* Effective January 1, 1985, however, the General Assembly amended R.C. 5735.145, adding subsection (B), which provides:

"The qualified fuel otherwise eligible for the qualified fuel credit *shall not contain ethanol produced outside Ohio unless the tax commissioner determines that the fuel claimed to be eligible for credit contains ethanol produced in a state that also grants an exemption, credit or refund from such state's motor vehicle fuel excise tax or sales tax for similar fuel containing ethanol produced in Ohio;* provided, however, that such credit shall not exceed the amount of the credit allowable for qualified fuel containing ethanol produced in Ohio." (Emphasis added.)

Thus, R.C. 5735.145(B) facially discriminates against interstate commerce. As the majority appears to concede, it also attempts to force other states to enact reciprocal legislation. Accordingly, as the majority recognizes, the statute is subject to the "strictest scrutiny." See *Sporhase* v. *Nebraska, ex rel. Douglas* (1982), 458 U.S. 941, 958; *Hughes* v. *Oklahoma, supra,* at 337. Nevertheless, the ma-

jority fails to strictly scrutinize R.C. 5735.145(B). The majority's analysis is flawed in four separate respects.

## A

First, the majority errs in insisting that R.C. 5735.145(B) regulates "evenhandedly," and in attempting to analogize the cause *sub judice* to *CTS Corp.* v. *Dynamics Corp. of America* (1987), 481 U.S. ___, 95 L. Ed. 2d 67, *Minnesota* v. *Clover Leaf Creamery Co.* (1981), 449 U.S. 456, and *Exxon Corp.* v. *Governor of Maryland* (1978), 437 U.S. 117. The Ohio statute (R.C. 5735.145[B]) is decidedly distinguishable from the statutes at issue in those cases.

In *CTS*, the Indiana statute gave protection to Indiana corporations from *all* hostile tender offers; it made no distinction between tender offers coming from within the state and those coming from outside it. Likewise, in *Clover Leaf Creamery*, the statute at issue simply forbade the sale of milk in nonreturnable, nonrefillable plastic containers; nothing in the statute distinguished between containers made in Minnesota and containers made elsewhere. Finally, in *Exxon*, the Maryland statute prohibited *all* producers and refiners of petroleum products from also operating retail gas stations in Maryland; it drew no geographical lines separating those producers or refiners.

In stark contrast, R.C. 5735.145 (B) contains an *explicit* distinction between ethanol produced in Ohio and ethanol produced in states not granting a reciprocal tax credit. R.C. 5735.145(B) is thus plainly discriminatory on its face. Repetitious assertion by the majority that R.C. 5735.145(B) regulates "evenhandedly" is no substitute for analysis of the law.

Certainly the majority cannot muster support for such assertions from *CTS, supra*. In that case, the United States Supreme Court explained, in a passage only partially quoted by the majority:

"The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce. * * * The Indiana Act is not such a statute. *It has the same effects on tender offers whether or not the offeror is a domiciliary or resident of Indiana. * * *

"* * * Because nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors,* we reject the contention that the Act discriminates against interstate commerce." (Emphasis added.) *Id.* at ___, 95 L. Ed. 2d at 84.

Nor can the majority rely upon *Clover Leaf Creamery, supra*, wherein the Supreme Court emphasized:

"Minnesota's statute does not effect 'simple protectionism,' but 'regulates evenhandedly' by prohibiting all milk retailers from selling their products in plastic, nonreturnable milk containers, *without regard to whether the milk, the containers, or the sellers are from outside the State. This statute is therefore unlike statutes discriminating against interstate commerce, which we have consistently struck down.*" (Emphasis added.) *Id.* at 471-472.

With all deference to the majority, R.C. 5735.145(B) is not a statute that imposes a burden upon businesses which, *coincidentally,* happen to be located outside Ohio. R.C. 5735.145(B) is a gun, aimed at businesses located outside Ohio.

## B

In its attempt to wish away the distinction between R.C. 5735.145(B) and the statutes in *CTS, Clover Leaf Creamery* and *Exxon,* the majority

seizes on the credit given to ethanol producers in states that do grant reciprocal tax credits. Referring to those producers, the majority boasts that R.C. 5735.145(B) "does not give an advantage *solely* to Ohio producers." (Emphasis added.) The majority apparently believes that a statute which grants a commercial advantage to in-state businesses does not discriminate against interstate commerce unless the advantage is granted "*solely*" to the in-state businesses. Contrary to this belief, the constitutional infirmity of R.C. 5735.145(B) is *aggravated* by its forced reciprocity provision.

The majority's position is undermined by *Great A & P Tea Co.* v. *Cottrell* (1976), 424 U.S. 366. In *A & P,* the Mississippi regulation at issue permitted the importation of milk produced in another state *only if that state accepted milk produced in Mississippi on a reciprocal basis.* Thus, as with R.C. 5735.145(B), the regulation did not "solely" protect in-state businesses. Milk producers outside Mississippi were also protected if their state allowed the importation of milk from Mississippi. Nevertheless, the United States Supreme Court struck down the mandatory reciprocity provision because upholding it would " 'invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause.' " *Id.* at 380 (quoting *Dean Milk Co.* v. *Madison* [1951], 340 U.S. 349, 356).[2]

The majority acknowledges that the forced reciprocity provision in R.C. 5735.145(B) is a "thorny problem," but rationalizes it away on the premise that a decision favorable to appellant would cause other states' reciprocal tax credit programs to "fall like a row of dominos." However, the United States Supreme Court has emphasized that the tax laws of other states are irrelevant to a determination of whether a particular state's statute violates the Commerce Clause. See *Tyler Pipe Industries, Inc.* v. *Washington Dept. of Revenue* (1987), 483 U.S. ___, ___, 97 L. Ed. 2d 199, 210, wherein the court proclaimed, as to the tax therein at issue:

"The facial unconstitutionality of Washington's gross receipts tax cannot be alleviated by examining the effect of legislation enacted by its sister States."

The Supreme Court in *Tyler Pipe Industries* emphasized: " 'The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment.' " *Id.* at ___, 97 L. Ed. 2d at 210, fn. 11 (quoting *Freeman* v. *Hewit, supra,* at 256, and *Armco Inc.* v. *Hardesty* [1984], 467 U.S. 638, 645, at fn. 8).

Therefore, the majority's attempt to escape from the facial discrimination of R.C. 5735.145(B) lands it squarely within the briar patch of forced reciprocity.

C

In its claim that R.C. 5735.145(B) is constitutional because it does not effect a *complete ban* upon the importation of ethanol from non-reciprocating states, the majority errs again. Even if it is assumed that the practical effect

---

[2] See, also, *Best & Co., Inc.* v. *Maxwell, supra,* wherein the United States Supreme Court held unconstitutional a North Carolina privilege tax imposed upon businesses which displayed merchandise for sale in that state but which were not "regular retail merchants" therein. As with R.C. 5735.145(B), the invalid North Carolina tax favored all in-state sellers and *some* out-of-state sellers.

of a competitive disadvantage of twenty-five cents per gallon of ethanol is not tantamount to a complete ban, the majority's claim nonetheless fails because it rests upon the false premise that a complete ban is necessary to constitute a Commerce Clause violation.

In numerous cases, the United States Supreme Court has invalidated discriminatory state taxes without requiring that they be so drastic as to erect an impenetrable barricade to commerce at the state border. See, e.g., *Tyler Pipe Industries, supra; Bacchus Imports, Ltd.* v. *Dias* (1984), 468 U.S. 263; *Armco, supra; Maryland* v. *Louisana* (1981), 451 U.S. 725; *Boston Stock Exchange, supra.*[3]

Indeed, the law on discriminatory state taxes has been established for at least a century. In *Walling* v. *Michigan* (1886), 116 U.S. 446, 455, the court declared:

"A discriminatory tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first mentioned State, is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States."[4]

Thus, the alleged absence of a complete ban upon the importation of ethanol by R.C. 5735.145(B) does not save this statute.

## III

The majority makes its fourth and final error when it suggests that this court, if it finds R.C. 5735.145(B) unconstitutional, must then invalidate *all* of R.C. 5735.145. There is no merit in this suggestion. This court could, and should, hold that R.C. 5735.145(B) *alone* is invalid. The result of such holding would be that the tax credit of R.C. 5735.145 would be available to dealers with respect to *all* ethanol sold, used, or distributed in Ohio—not just for ethanol which originates in Ohio or in a state which grants reciprocal tax credits to Ohio producers. That result, unlike the one reached by the majority, would accomplish the evenhanded treatment mandated by the Commerce Clause.

The United States Supreme Court recently emphasized in *Tyler Pipe Industries, supra:* " 'The conclusion is inescapable: equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state.' " *Id.* at ____, 97 L. Ed. 2d at 213 (quoting *Halliburton Oil Well Cementing Co.* v. *Reily* [1963], 373 U.S. 64, 70). Because R.C. 5735.145(B) fails to satisfy that condition precedent, I must respectfully dissent.

SWEENEY, Acting C.J., and LOCHER, J., concur in the foregoing dissenting opinion.

---

[3] State regulations, as opposed to taxes, also need not effect a total ban upon importation to impermissibly burden or discriminate against interstate commerce. See *Hunt* v. *Washington State Apple Advertising Comm.* (1977), 432 U.S. 333, wherein the court invalidated a facially neutral North Carolina statute requiring closed containers of out-of-state apples to bear no quality grade markings showing other than the applicable federal grade. Such regulation plainly did not completely ban the importation of out-of-state apples, but it did put their growers at a competitive disadvantage.

[4] This passage was recently quoted with approval in *Bacchus Imports, supra,* at 271.