## NEW ENERGY COMPANY OF INDIANA *v.* LIMBACH, TAX COMMISSIONER OF OHIO, ET AL.

No. 87–654.   Argued March 29, 1988—Decided May 31, 1988

SCALIA, J., delivered the opinion for a unanimous Court.

*Herman Schwartz* argued the cause for appellant. With him on the briefs was *David J. Young.*

*Richard C. Farrin*, Assistant Attorney General of Ohio, argued the cause for appellees. With him on the brief for appellees Limbach et al. was *Anthony J. Celebrezze, Jr.*, Attorney General. *David C. Crago* and *Karen B. Mozenter* filed a brief for appellee South Point Ethanol.*

*Briefs of *amici curiae* urging affirmance were filed for the State of Idaho et al. by *Michael H. Gottesman, Peter O. Shinevar, James T. Jones,* Attorney General of Idaho, *Tam B. Ormiston,* Assistant Attorney General of Iowa, *Robert T. Stephan,* Attorney General of Kansas, and *Hubert H.*

JUSTICE SCALIA delivered the opinion of the Court.

Appellant New Energy Company of Indiana has challenged the constitutionality of Ohio Rev. Code Ann. § 5735.145(B) (1986), a provision that awards a tax credit against the Ohio motor vehicle fuel sales tax for each gallon of ethanol sold (as a component of gasohol) by fuel dealers, but only if the ethanol is produced in Ohio or in a State that grants similar tax advantages to ethanol produced in Ohio. The question presented is whether § 5735.145(B) discriminates against interstate commerce in violation of the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3.

I

Ethanol, or ethyl alcohol, is usually made from corn. In the last decade it has come into widespread use as an automotive fuel, mixed with gasoline in a ratio of 1 to 9 to produce what is called gasohol. The interest in ethanol emerged in reaction to the petroleum market dislocations of the early 1970's. The product was originally promoted as a means of achieving energy independence while providing a market for surplus corn; more recently, emphasis has shifted to its environmental advantages as a replacement for lead in enhancing fuel octane. See United States Department of Agriculture, Ethanol: Economic and Policy Tradeoffs 1 (1988). Ethanol was, however (and continues to be), more expensive than gasoline, and the emergence of ethanol production on a commercial scale dates from enactment of the first federal subsidy, in the form of an exemption from federal motor fuel excise taxes, in 1978. See Energy Tax Act of 1978, Pub. L. 95–618, § 221, 92 Stat. 3185, codified, as amended, at 26 U. S. C. §§ 4041, 4081 (1982 ed. and Supp. IV). Since then, many States, particu-

*Humphrey III*, Attorney General of Minnesota; for the State of Illinois by *Neil F. Hartigan*, Attorney General, *Shawn W. Denney*, Solicitor General, and *Rosalyn B. Kaplan* and *Michael Wynne*, Assistant Attorneys General; and for the National Governors' Association et al. by *Benna Ruth Solomon* and *Stuart A. Smith*.

larly those in the grain-producing areas of the country, have enacted their own ethanol subsidies. See United States General Accounting Office, Importance and Impact of Federal Alcohol Fuel Tax Incentives 5 (1984). Ohio first passed such a measure in 1981, providing Ohio gasohol dealers a credit of so many cents per gallon of ethanol used in their product against the Ohio motor vehicle fuel sales tax payable on both ethanol and gasoline. This credit was originally available without regard to the source of the ethanol. See Act of June 10, 1981, § 1, 1981–1982 Ohio Leg. Acts 1693, 1731–1732. In 1984, however, Ohio enacted § 5735.145(B), which denies the credit to ethanol coming from States that do not grant a tax credit, exemption, or refund to ethanol from Ohio, or, if a State grants a smaller tax advantage than Ohio's, granting only an equivalent credit to ethanol from that State.[1]

Appellant is an Indiana limited partnership that manufactures ethanol in South Bend, Indiana, for sale in several States, including Ohio. Indiana repealed its tax exemption for ethanol, effective July 1, 1985, see Act of Mar. 5, 1984, §§ 4, 5, 8, 1984 Ind. Acts 189, 194–195, at which time it also passed legislation providing a direct subsidy to Indiana ethanol producers (the sole one of which was appellant). See Ind. Code §§ 4–4–10.1 to 4–4–10.8 (Supp. 1987). Thus, by

---

[1] Section 5735.145(B) provides:

"The qualified fuel otherwise eligible for the qualified fuel credit shall not contain ethanol produced outside Ohio unless the tax commissioner determines that the fuel claimed to be eligible for credit contains ethanol produced in a state that also grants an exemption, credit or refund from such state's motor vehicle fuel excise tax or sales tax for similar fuel containing ethanol produced in Ohio; provided however, that such credit shall not exceed the amount of the credit allowable for qualified fuel containing ethanol produced in Ohio."

This provision was passed in 1984 and took effect on January 1, 1985. After this litigation began, Ohio again amended its ethanol credit statute to reduce the amount of the credit and scheduled it for elimination in 1993. See Ohio Rev. Code Ann. § 5735.145 (Supp. 1987).

reason of Ohio's reciprocity provision, appellant's ethanol sold in Ohio became ineligible for the Ohio tax credit. Appellant sought declaratory and injunctive relief in the Court of Common Pleas of Franklin County, Ohio, alleging that § 5735.145(B) violated the Commerce Clause by discriminating against out-of-state ethanol producers to the advantage of in-state industry.[2] The court denied relief, and the Ohio Court of Appeals affirmed. A divided Ohio Supreme Court initially reversed, finding that § 5735.145(B) discriminated without adequate justification against products of out-of-state origin, and shielded Ohio producers from out-of-state competition. The Ohio Supreme Court then granted appellees' motion for rehearing and reversed itself, a majority of the court finding that the provision was not protectionist or unreasonably burdensome. 32 Ohio St. 3d 206, 513 N. E. 2d 258 (1987). We noted probable jurisdiction. 484 U. S. 984 (1987).

## II

It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce. See, e. g., *Hughes* v. *Oklahoma*, 441 U. S. 322, 326 (1979); *H. P. Hood & Sons, Inc.* v. *Du Mond*, 336 U. S. 525, 534–535 (1949); *Welton* v. *Missouri*, 91 U. S. 275 (1876). This "negative" aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state compet-

---

[2] Appellant also argued there, as it has here, that § 5735.145(B) was an excessive burden on commerce under the test set forth in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). To the extent that claim requires separate analysis we find it unnecessary to reach it, in light of our disposition of the discrimination claim. Appellant also alleged in the state courts violations of the Equal Protection Clause and the Privileges and Immunities Clause of the Fourteenth Amendment; those challenges are not at issue in this appeal.

itors. See, *e. g.*, *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 270–273 (1984); *H. P. Hood & Sons, supra*, at 532–533; *Guy* v. *Baltimore*, 100 U. S. 434, 443 (1880). Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down, see, *e. g.*, *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941 (1982); *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27 (1980); *Dean Milk Co.* v. *Madison*, 340 U. S. 349 (1951), unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism, see, *e. g.*, *Maine* v. *Taylor*, 477 U. S. 131 (1986).

The Ohio provision at issue here explicitly deprives certain products of generally available beneficial tax treatment because they are made in certain other States, and thus on its face appears to violate the cardinal requirement of nondiscrimination. Appellees argue, however, that the availability of the tax credit to some out-of-state manufacturers (those in States that give tax advantages to Ohio-produced ethanol) shows that the Ohio provision, far from discriminating against interstate commerce, is likely to promote it, by encouraging other States to enact similar tax advantages that will spur the interstate sale of ethanol. We rejected a similar contention in an earlier "reciprocity" case, *Great Atlantic & Pacific Tea Co.* v. *Cottrell*, 424 U. S. 366 (1976). The regulation at issue there permitted milk from out of State to be sold in Mississippi only if the State of origin accepted Mississippi milk on a reciprocal basis. Mississippi put forward, among other arguments, the assertion that "the reciprocity requirement is in effect a free-trade provision, advancing the identical national interest that is served by the Commerce Clause." *Id.*, at 378. In response, we said that "Mississippi may not use the threat of economic isolation as a weapon to force sister States to enter into even a desirable reciprocity agreement." *Id.*, at 379. More recently, we characterized a Nebraska reciprocity requirement for the export of ground water from the State as "facially discriminatory legislation"

which merited " 'strictest scrutiny.' " *Sporhase* v. *Nebraska ex rel. Douglas, supra*, at 958, quoting *Hughes* v. *Oklahoma, supra*, at 337.

It is true that in *Cottrell* and *Sporhase* the effect of a State's refusal to accept the offered reciprocity was total elimination of all transport of the subject product into or out of the offering State; whereas in the present case the only effect of refusal is that the out-of-state product is placed at a substantial commercial disadvantage through discriminatory tax treatment. That makes no difference for purposes of Commerce Clause analysis. In the leading case of *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), the New York law excluding out-of-state milk did not impose an absolute ban, but rather allowed importation and sale so long as the initial purchase from the dairy farmer was made at or above the New York State-mandated price. In other words, just as the appellant here, in order to sell its product in Ohio, only has to cut its profits by reducing its sales price below the market price sufficiently to compensate the Ohio purchaser-retailer for the forgone tax credit, so also the milk wholesaler-distributor in *Baldwin*, in order to sell its product in New York, only had to cut its profits by increasing its purchase price above the market price sufficiently to meet the New York-prescribed minimum. We viewed the New York law as "an economic barrier against competition" that was "equivalent to a rampart of customs duties." *Id.*, at 527. Similarly, in *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S. 333, 349–351 (1977), we found invalid under the Commerce Clause a North Carolina statute that did not exclude apples from other States, but merely imposed additional costs upon Washington sellers and deprived them of the commercial advantage of their distinctive grading system. The present law likewise imposes an economic disadvantage upon out-of-state sellers; and the promise to remove that if reciprocity is accepted no more justifies disparity of treatment than it would justify categorical exclusion. We

have indicated that reciprocity requirements are not *per se* unlawful. See *Cottrell, supra,* at 378. But the case we cited for that proposition, *Kane* v. *New Jersey,* 242 U. S. 160, 167–168 (1916), discussed a context in which, if a State offered the reciprocity did not accept it, the consequence was, to be sure, *less favored* treatment for its citizens, but nonetheless treatment that complied with the minimum requirements of the Commerce Clause. Here, quite to the contrary, the threat used to induce Indiana's acceptance is, in effect, taxing a product made by its manufacturers at a rate higher than the same product made by Ohio manufacturers, without (as we shall see) justification for the disparity.

Appellees argue that § 5735.145(B) should not be considered discrimination against interstate commerce because its practical scope is so limited. Apparently only one Ohio ethanol manufacturer exists (appellee South Point Ethanol) and only one out-of-state manufacturer (appellant) is clearly disadvantaged by the provision. Our cases, however, indicate that where discrimination is patent, as it is here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown. For example, in *Bacchus Imports, Ltd.* v. *Dias, supra,* we held unconstitutional under the Commerce Clause a special exemption from Hawaii's liquor tax for certain locally produced alcoholic beverages (okolehao and fruit wine), even though other locally produced alcoholic beverages were subject to the tax. *Id.,* at 265, 271. And in *Lewis* v. *BT Investment Managers, Inc., supra,* we held unconstitutional a Florida statute that excluded from certain business activities in Florida not all out-of-state entities, but only out-of-state bank holding companies, banks, or trust companies. In neither of these cases did we consider the size or number of the in-state businesses favored or the out-of-state businesses disfavored relevant to our determination. Varying the strength of the bar against economic protectionism according to the size and number of in-state and out-of-state firms affected would

serve no purpose except the creation of new uncertainties in an already complex field.

Appellees contend that even if § 5735.145(B) is discriminatory, the discrimination is not covered by the Commerce Clause because of the so-called market-participant doctrine. That doctrine differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause. See *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 806–810 (1976). Thus, for example, when a State chooses to manufacture and sell cement, its business methods, including those that favor its residents, are of no greater constitutional concern than those of a private business. See *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 438–439 (1980).

The market-participant doctrine has no application here. The Ohio action ultimately at issue is neither its purchase nor its sale of ethanol, but its assessment and computation of taxes — a primeval governmental activity. To be sure, the tax credit scheme has the purpose and effect of subsidizing a particular industry, as do many dispositions of the tax laws. That does not transform it into a form of state participation in the free market. Our opinion in *Alexandria Scrap, supra,* a case on which appellees place great reliance, does not remotely establish such a proposition. There we examined, and upheld against Commerce Clause attack on the basis of the market-participant doctrine, a Maryland cash subsidy program that discriminated in favor of in-state auto-hulk processors. The purpose of the program was to achieve the removal of unsightly abandoned autos from the State, *id.,* at 796–797, and the Court characterized it as proprietary rather than regulatory activity, based on the analogy of the State to a private purchaser of the auto hulks, *id.,* at 808–810. We have subsequently observed that subsidy programs unlike that of *Alexandria Scrap* might not be characterized as proprietary. See *Reeves, Inc., supra,* at 440, n. 14. We think

it clear that Ohio's assessment and computation of its fuel sales tax, regardless of whether it produces a subsidy, cannot plausibly be analogized to the activity of a private purchaser.

It has not escaped our notice that the appellant here, which is eligible to receive a cash subsidy under Indiana's program for in-state ethanol producers, is the potential beneficiary · of a scheme no less discriminatory than the one that it attacks, and no less effective in conferring a commercial advantage over out-of-state competitors. To believe the Indiana scheme is valid, however, is not to believe that the Ohio scheme must be valid as well. The Commerce Clause does not prohibit all state action designed to give its residents an advantage in the marketplace, but only action of that description *in connection with the State's regulation of interstate commerce.* Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation of out-of-state manufacturers does. Of course, even if the Indiana subsidy were invalid, retaliatory violation of the Commerce Clause by Ohio would not be acceptable. See *Cottrell,* 424 U. S., at 379–380.

## III

Our cases leave open the possibility that a State may validate a statute that discriminates against interstate commerce by showing that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. See, *e. g., Maine* v. *Taylor,* 477 U. S., at 138, 151; *Sporhase* v. *Nebraska ex rel. Douglas,* 458 U. S., at 958; *Hughes* v. *Oklahoma,* 441 U. S., at 336–337; *Dean Milk Co.* v. *Madison,* 340 U. S., at 354. This is perhaps just another way of saying that what may appear to be a "discriminatory" provision in the constitutionally prohibited sense — that is, a protectionist enactment — may on closer analysis not be so. However it be put, the standards for such justification are high. Cf. *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978) ("[W]here simple economic protectionism is

effected by state legislation, a virtually *per se* rule of invalidity has been erected"); *Hughes* v. *Oklahoma, supra,* at 337 ("[F]acial discrimination by itself may be a fatal defect" and "[a]t a minimum . . . invokes the strictest scrutiny").

Appellees advance two justifications for the clear discrimination in the present case: health and commerce. As to the first, they argue that the provision encourages use of ethanol (in replacement of lead as a gasoline octane-enhancer) to reduce harmful exhaust emissions, both in Ohio itself and in surrounding States whose polluted atmosphere may reach Ohio. Certainly the protection of health is a legitimate state goal, and we assume for purposes of this argument that use of ethanol generally furthers it. But § 5735.145(B) obviously does not, except perhaps by accident. As far as ethanol use in Ohio itself is concerned, there is no reason to suppose that ethanol produced in a State that does not offer tax advantages to ethanol produced in Ohio is less healthy, and thus should have its importation into Ohio suppressed by denial of the otherwise standard tax credit. And as far as ethanol use outside Ohio is concerned, surely that is just as effectively fostered by other States' subsidizing ethanol production or sale in some fashion other than giving a tax credit to Ohio-produced ethanol; but these helpful expedients do not qualify for the tax credit. It could not be clearer that health is not the purpose of the provision, but is merely an occasional and accidental effect of achieving what is its purpose, favorable tax treatment for *Ohio*-produced ethanol.[3] Essentially the same reasoning also responds to appellees' second (and related) justification for the discrimination, that the reciprocity

---

[3] We do not interpret the trial court's acceptance of appellees' proposed finding of fact of April 10, 1985, as a judicial finding that protecting health was in fact a purpose of the Ohio General Assembly, rather than merely one of several conceivable purposes for the enactment. In any event, a subjective purpose that has so little rational relationship to the provision in question is not merely implausible but, even if true, inadequate to validate patent discrimination against interstate commerce.

requirement is designed to increase commerce in ethanol by encouraging other States to enact ethanol subsidies. What is encouraged is not ethanol subsidies in general, but only favorable treatment for Ohio-produced ethanol. In sum, appellees' health and commerce justifications amount to no more than implausible speculation, which does not suffice to validate this plain discrimination against products of out-of-state manufacture.

\*     \*     \*

For the reasons stated, the judgment of the Ohio Supreme Court is

*Reversed.*