REQUESTED BY: Senator Edward J. Schrock, 38th Legislative District
You have requested an opinion from the Office of Attorney General on the constitutionality of Legislative Bill 389. The proposed legislation requires that by January 1, 2001, one-half of all gasoline sold for use as motor fuel in Nebraska shall contain an oxygen content that is greater than or equal to 2.7 percent by weight.[1] The legislation provides certain exceptions to the one-half requirement for the use of non-oxygenated gasoline in specifically named vehicles.[2]
You have specifically asked for a determination on whether, in the absence of a federal oxygenated gasoline requirement, is a state legally able to impose a standard that modifies generic gasoline and which may impede the marketing of this product in one or more states. You have also stated that there is some uncertainty as to whether current federal law setting requirements for the use of oxygenated fuels will remain intact. It is the adoption of this proposed state fuel standard in the absence of a federal requirement that is the subject of your inquiry.
[1] See Legislative Bill 389, 96th Neb. Leg., 1st Sess. (Neb. 1999). The legislation provides an extended timetable for the implementation of the 50 percent requirement depending on current levels of oxygenated motor fuel use within the state.
[2] See L.B. 389, § 1 (3) and (4). Exceptions to the mandate are limited to the use of non-oxygenated fuels in historical vehicles, vehicles eligible to be licensed as historical vehicles, off-road vehicles, motorcycles, boats, snowmobiles, small engines, and aircraft.
 DISCUSSION
The Commerce Clause found in the United States Constitution gives Congress the ability to regulate interstate commerce. The clause provides "[t]he Congress shall have the power . . . to regulate Commerce . . . among several States." U.S. Const. art. I, § 8. This clause establishes that Congress' power over interstate commerce is plenary and pervasive. However, the power has been established to be nonexclusive and is shared with states to a certain degree.
The United States Supreme Court allows state regulation of interstate commerce — where Congress has not preempted by law an area of commerce, in cases where the regulation does not discriminate against out-of-state competition to benefit local economic interests, and where the regulation is not unduly burdensome. The Supreme Court describes the states' power to regulate interstate commerce as follows:
 This Court has adopted what amounts to a two-tiered approach to analyzing a state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. . . . When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether a State's interest is legitimate and whether the burden on interstate commerce clearly exceeds local benefits. (Pike v. Bruce Church, Inc.) We have also recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the Pike v. Bruce Church balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.
Brown-Forman Distillers Corporation v. New York State LiquorAuthority, 476 U.S. 573, 578-79, 106 S. Ct. 2080, 2084 (1986) (Citations omitted). See also Pike v. Bruce Church, Inc.,397 U.S. 137, 90 S. Ct. 844 (1970).
According to the Court, if there is no federal legislation that supersedes or preempts the field of commerce, then a state may regulate commerce unless it is determined that the regulation discriminates against interstate or out-of-state commerce, or places an undue burden on the free flow of interstate commerce. In cases where the legislation is discriminatory, it will be invalid unless it furthers an important state interest and there are no reasonable nondiscriminatory alternatives. If the legislation does not discriminate but burdens interstate commerce, it will be invalid if the burden on commerce outweighs the state's interest.
For the purpose of this request, we will not determine whether the federal government has preempted the area of commerce that LB 389 attempts to regulate. In your request for an opinion, you asked whether LB 389 was constitutional in the absence of any preemptive or superseding federal legislation. Given the narrow focus of your opinion request, we will not consider whether there are any existing federal laws that would preempt the implementation of LB 389. We do note that if a federal law was found by the courts to regulate the area of commerce under which LB 389 intends to operate, a finding by the Court that LB 389 was unconstitutional would be reasonable under a current interpretation of case law.
The first consideration is whether LB 389 discriminates against interstate or out-of-state commerce. Discrimination occurs where a state regulation is designed to favor in-state commerce to the detriment of out-of-state commerce flowing into the state. The U.S. Supreme Court has stated:
 It has long been accepted that the Commerce Clause not only grants Congress the authority to regulate commerce among the states, but also directly limits the power of the states to discriminate against interstate commerce. This "negative" aspect of the Commerce Clause prohibits economic protectionism — that is, regulatory measures designed to benefit instate economic interests by burdening out-of-state competitors. Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down, unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.
New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273-74,108 S. Ct. 1803, 1807-08 (1988) (Citations omitted).
With the adoption of LB 389, there will be a greater demand for oxygenated fuels as suppliers purchase more quantities of ethanol and other fuel additives in order to come into compliance with the requirements imposed by the statute. Nebraska is a large producer of ethanol and LB 389 would have the effect of creating a greater demand for ethanol, thus benefitting the producers of ethanol within the state.[3] Even though there is a likely economic benefit that would result in Nebraska from the adoption of LB 389, this does not necessarily cause LB 389 to be discriminating against out-of-state producers of such fuel additives. LB 389 does not restrict out-of-state producers from importing ethanol to be mixed with gasoline, nor does it prohibit other fuel additives to be used in place of ethanol, such as MTBE or ETBE to increase the oxygenated capacity found in gasoline. LB 389 does not facially discriminate against out-of-state producers of oxygenated fuel additives to the benefit of in-state ethanol producers.
Since LB 389 does not discriminate against interstate commerce and out-of-state producers, the next question is whether LB 389 places an undue burden on the free flow of interstate commerce. If there is an undue burden, courts will invalidate the measure if the burden on commerce outweighs the state's interest.
Currently, gasoline in Nebraska is transported via pipelines that bring the product into the state from refineries located primarily in coastal states. The pipelines distribute the gasoline to twelve main petroleum pipeline terminals located throughout the state. Trucks are then used to transport the gasoline from the pipeline terminals to retail outlets for purchase by consumers. In some instances, gasoline from these terminals is sold for out-of-state consumption. Also, in certain areas of the state it is more feasible for retail service stations to import gasoline into the state for sale to customers because out-of-state pipeline terminals are closer than instate pipeline terminals.
Ethanol and other oxygenated additives are added to gasoline at these pipeline terminals. These oxygenated enhancing fuels are mixed with the gasoline through a computerized in-line blending system. After a truck has been filled with pure gasoline, ethanol (or other fuel) is added into the tank of the truck. The final product is mixed in the tank and is then transported to the retail outlet. The distributor makes the final determination as to whether ethanol is added to his supply of gasoline based on the quantities required by the retail seller. Once the fuel additive is mixed with the gasoline, the resulting product is unable to be separated back into its original form.
LB 389 would require that one-half of all gasoline sold for use as motor fuel in Nebraska contain an oxygenated content equal to 2.7 percent by weight for use in non-exempted types of vehicles. This would place a burden on interstate commerce because distributors importing gasoline into Nebraska would have to meet the requirements imposed by LB 389. Such distributors would have to reduce their amount of non-oxygenated gasoline that they deliver to retail service stations to comply with the limitations imposed by LB 389. This burden would be minimized by the fact that most gasoline transported into Nebraska is through a pipeline and enters the state in a pure form, prior to being mixed with ethanol, ETBE or MTBE. The burden then would primarily fall upon the out-of-state suppliers rather than instate distributors who have the ability to determine at the pipeline terminals the quantity of gasoline product they choose to mix with ethanol, ETBE or MTBE based upon the demand of such fuel.
For gasoline product that is distributed to other states, distributors would have the ability to deliver pure gasoline product, free from additives, to retail service stations located outside of Nebraska. LB 389 would not prohibit distributors from choosing to ship non-oxygenated gasoline to out-of-state retail markets. Pipelines running through Nebraska connecting to terminals in other states would not be affected by the provisions in LB 389 because they only apply to the retail sale of gasoline. Thus, the burden on interstate commerce would be relatively minor as far as the distribution network is concerned.
With this burden that would be placed upon interstate commerce, it should be weighed against the state's interest and benefits that may be gained by the imposition of LB 389. There are a number of stated environmental benefits that result from the use of oxygenated fuels. Such benefits include: reduction of carbon monoxide emissions; reductions in ozone pollution due to the lower reactivity of the fuel; lower toxicity than other octane enhancers such as benzene, toluene and xylene; a lower gasoline volatility that reduces the VOC emissions from automobiles; and in the case of some oxygenated additives, fuels such as ethanol are renewable.[4] The state's interest in increasing the requirements for use of oxygenated fuels may be found in these possible benefits to the environment.
Courts take into account the state's interest based on the state's need to promote health and safety matters within its boundaries. The United States Court of Appeals of the Eighth Circuit has expressed that:
 (a) State's power to regulate commerce is greatest when they act on matters of local concern, and state regulations enacted to promote public health and safety are accorded particular deference. Challengers to state regulations enacted to further public safety must overcome a `strong presumption of their validity'. . . . [t]he Court consistently has incorporated into its analysis some evaluation of the burden that the legislation in question places on interstate commerce. The balancing must, however, reflect great deference due state safety legislation. The challengers may prevail only if the burden on interstate commerce is clearly excessive in relation to the safety purpose of the state legislation.
Burlington Northern R. Co. v. State of Nebraska, 802 F.2d 994
(8th Cir. 1986) (Citations omitted). The Court outlines the deference it gives to states to determine the best means to achieve an outcome in matters of health and safety. Such deference is limited in cases where the burden placed on interstate commerce is excessive given the likely benefits sought by the state.
The environmental and other benefits gained from implementing LB 389 would be considered the state's interest in this matter under its concern for the health and safety of its citizens. These benefits would be balanced against the possible burden to interstate commerce. Courts would grant deference to the State of Nebraska in adopting LB 389 if they reasoned that the burden from requiring a greater use of oxygenated gasoline was not excessive when compared to the benefits achieved by the legislation.
In our opinion, given the current design of the distribution network in Nebraska for the delivery of gasoline, it would appear that such burdens would be minimal when compared to the likely benefits gained from increased use of ethanol. Thus, courts would have to make the final determination as to whether the burden was excessive given the likely benefits.
 CONCLUSION
In our opinion, LB 389 would be upheld as constitutional, even if current federal law were repealed, because in our estimation, the likely benefits gained by the implementation of LB 389 would exceed the burden imposed upon interstate commerce. This burden is minimal given the manner in which gasoline is brought into the state through pipelines, the ease in which oxygenated fuels are added and mixed at the pipeline terminals, and the ability of the distributor to continue to deliver non-oxygenated gasoline to out-of-state retail service stations.
Sincerely,
 Don Stenberg Attorney General
 Jason W. Hayes Assistant Attorney General
pc: Patrick J. O'Donnell Clerk of the Legislature
Approved:
Don Stenberg 
Attorney General
[3] According to the Nebraska Ethanol Board, as of 1998 there are a total of six ethanol processing plants within the state, which have the capacity to produce 273.5 million gallons of ethanol each year.
[4] Such benefits are based on findings presented by the American Coalition for Ethanol.