NATIONAL ASSOCIATION OF FUND-RAISING TICKET MANUFACTURERS; American Games, Inc.; Bonanza Press, Inc.; Bingo King Company, Inc.; Ace Novelty Co., Inc.; Arrow International, Inc.; Douglas Press, Inc.; International Gamco, Inc.; Trade Products, Inc.; Universal Manufacturing Co., Inc.; World Wide Press, Inc., Plaintiffs,

v.

Hubert H. HUMPHREY, III, in his official capacity as Attorney General of Minnesota; Anthony Bouza, in his official capacity as Commissioner of Gaming of the State of Minnesota; Sally Howard, Robert Fragnito, Barbara Grove, Raymond Joachim, Anthony Thomas, Sr., and Nicholas Zuber, in their official capacities as members of the Gambling Control Board; and Thomas Anzelc, in his official capacity as Director of the Division of Gambling Control, Defendants.

No. Civ. 4–90–770.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 27, 1990.

---

Richard A. Kaplan, John M. Baker, Popham, Haik, Schnobrich, & Kaufman, Ltd., Fred L. Morrison, Minneapolis, Minn., for plaintiffs.

Hubert H. Humphrey, Atty. Gen., and Jocelyn F. Olson, Asst. Atty. Gen., St. Paul, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on cross motions for summary judgment. Each of the motions will be granted in part and denied in part.

FACTS

This is an action to declare unconstitutional certain 1990 amendments to Minnesota law governing "pull-tab" gambling in the state of Minnesota. Effective July 1, 1992, all pull-tab tickets sold in Minnesota must be manufactured in Minnesota. Minn.Stat. § 349.163, subd. 3(b). Also, pursuant to these amendments, effective January 1, 1991 through June 30, 1992 all pull-tabs used in Minnesota must bear a distinguishing mark, "For Sale in Minnesota Only." Minn.Stat. § 349.163, subd. 3(a)(3); Minn.Stat. § 349.162, subd. 1(b). Further, effective July 1, 1992, the pull-tab must read "Manufactured in Minnesota For Sale in Minnesota Only." Minn.Stat. §§ 349.-163, subd. 3(a)(4); 349.162, subd. 1(c). A separate amendment provides that a distributor or organization may return to a manufacturer any gambling equipment determined to have been manufactured or labeled in violation of any law or rule. Minn.Stat. § 349.162, subd. 6.[1]

1. The statute does not specify an effective date    for this provision and, therefore, pursuant to

Plaintiffs contend that the manufacturing and labeling requirements erect unconstitutional trade barriers against interstate commerce and that the return requirement constitutes an unconstitutional impairment of manufacturers' contractual obligations. These issues will be discussed below.

DISCUSSION

I. *Whether the Manufacturing and Labeling Amendments Violate the Commerce Clause of the United States Constitution*

Article I, Section 8, Clause 3 of the Constitution grants Congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The Supreme Court has long recognized that the clause not only bestows powers upon Congress to regulate interstate commerce, but also limits the powers of the states to "erect barriers against interstate trade." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). The Commerce Clause limitation on state regulatory power, however, is not "absolute." *Id.* at 36, 100 S.Ct. at 2015. Notwithstanding the limitations of the clause, the states "retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Id.*

In scrutinizing state regulations under the Commerce Clause, courts inquire whether the regulations have only an "incidental" effect on interstate transactions, or whether they "affirmatively discriminate" against such transactions. *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 2447–48, 91 L.Ed.2d 110 (1986). Statutes which regulate "even-handedly" and which have only incidental effect on interstate commerce violate the clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits." *Id.*, 106 S.Ct. at 2448, *citing Pike v.*

*Bruce Church, Inc.*, 397 U.S. 137, 141, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). In such cases the extent of the burden which the Commerce Clause will accept depends on the nature of the local interest, and whether that interest can "be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. This relatively deferential review has been labeled the *"Pike* analysis."

Statutes which affirmatively discriminate against interstate transactions, however, are subject to stricter scrutiny. *Id.* Such laws are invalid unless the state demonstrates both that the statute (1) serves a legitimate local purpose, and (2) that this purpose could not be served adequately by available non-discriminatory means. *Maine v. Taylor*, 106 S.Ct. at 2455.[2] This test was set forth by the Supreme Court in *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979), and has been referred to as the *"Hughes* test." The Court has explained the difference between the two levels of review as follows:

> The opinions of the [Supreme] Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a state legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected.... The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a state's borders.... But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of

Minn.Stat. § 645.02, the effective date of subdivision 6 was August 1, 1990.

**2.** The analytic distinction between strict scrutiny and the less demanding *Pike* test is somewhat indistinct since both examine burdens on commerce in light of local purposes and available

alternatives. It is apparent from review of the Court's decisions in this area, however, that a closer means-end relationship is required of facially discriminatory regulation than that which has only an incidental effect on interstate commerce.

which were outlined in *Pike v. Bruce Church, Inc. . . . .*

*Philadelphia v. New Jersey*, 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978) (citations omitted). The Supreme Court has observed that statutes which directly regulate or discriminate against interstate commerce, or whose effect is to favor in-state economic interests over out-of-state interests, have been generally struck down "without further inquiry." *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). *See Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (New Jersey statute prohibiting importation of waste originating or collected outside the state struck down under Commerce Clause); *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925) (state regulatory scheme which had the effect of regulating interstate commerce in grain purchasing barred by Commerce Clause); *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (Illinois anti-takeover act violated Commerce Clause where it sought to regulate securities transactions having no connection with state, finding that "the Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state"); *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945) (state law struck down where the "practical effect of such regulation is to control [conduct] beyond the boundaries of the state . . ."); *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 109 S.Ct. 2491, 2501, 105 L.Ed.2d 275 (1989) (holding Connecticut's beer price affirmation statute violative of Commerce Clause, noting that the Supreme Court has "followed a consistent practice of striking down state statutes that clearly discriminate against interstate commerce . . . unless that discrimination is demonstrably justified by a valid factor unrelated to economic protectionism" (citations omitted)); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (Florida statute prohibiting out-of-state banks and others from owning or controlling Florida investment advisory businesses, and another statute prohibiting certain out-of-state corporations from performing certain trust and fiduciary functions, violative of Commerce Clause); *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 1811, 100 L.Ed.2d 302 (1988) (Ohio statute awarding tax credit only to ethanol producers from Ohio, or from states with reciprocal credit violative of Clause—health and commerce justifications found "no more than implausible speculation, which does not suffice to validate this plain discrimination against products of out-of-state manufacture"); *Sporhase v. Nebraska*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982) (state ban on transportation of Nebraska ground water to Colorado which forbids exportation of its ground water violative of Commerce Clause because restriction not "narrowly tailored" to legitimate goal of conservation or preservation of resources where state demonstrated no evidence of water shortage).[3]

A. *Whether the Requirement That Pull–Tabs Be Manufactured in Minnesota Violates the Commerce Clause*

■ Defendants concede that because the requirement that the pull-tabs be made in Minnesota (hereafter "the manufacturing requirement") affirmatively discriminates against interstate commerce, it is

---

**3.** While it clearly appears from a number of decisions that the state bears the burden of proof in cases applying strict scrutiny under *Hughes*, it appears the reverse is true with respect to the burden of proof issue under the *Pike* analysis. *See Proctor & Gamble Co. v. City of Chicago*, 509 F.2d 69, 76 (7th Cir.), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975); *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1035 (4th Cir.1980). The courts in *Proctor & Gamble* and *Telvest* placed the burden on the party challenging legislation subject to the *Pike* test. In light of the fact that the *Pike* test is intended to defer to the state's police powers where legislation has only an incidental effect on interstate commerce, it appears that this is a sound approach.

subject to the strict scrutiny set out in the *Hughes* test. Defendants argue, however, that the manufacturing requirement is justifiable because it serves the state's legitimate interest in ensuring the security and integrity of pull-tab gambling by allowing Minnesota regulators to closely monitor manufacturing processes and industry practices, an interest which defendants contend could not be as well served if pull-tabs were allowed to be manufactured in other states. According to defendants, there are currently twenty Minnesota licensed pull-tab manufacturers operating in sixteen states. Affidavit of John M. Baker, Exh. D, Transcript of April 3, 1990 Hearing of House Tax Committee at 8. Defendants argue that by requiring pull-tabs sold in Minnesota to be manufactured in Minnesota, Minnesota gaming inspectors will be better able to conduct their investigations to assure compliance with Minnesota regulations. Defendants argue that sufficiently frequent inspections in other states could be "astronomically expensive." Defendants further contend that to charge manufacturers with the cost of investigation would negatively impact the industry and hamper the ability of charitable and non-profit organizations to raise funds through pull-tab gaming. Defendants introduce no record evidence, however, in support of the assertion that frequent inspections in other states would be astronomically expensive, or that imposition of the costs of such inspections on manufacturers would negatively impact the industry.

Defendants rely on *Maine v. Taylor*, 106 S.Ct. 2440, in support of their contention that even when subject to strict scrutiny, the manufacturing requirement at issue in this case is constitutional. In *Maine v. Taylor*, a criminal prosecution, the issue was whether a state statute making it illegal to import bait fish into the state of Maine violated the Commerce Clause. The district court found that since the import ban discriminated on its face against interstate trade, it should be subject to strict scrutiny under *Hughes*. *Id.*, 106 S.Ct. at 2448. Following an evidentiary hearing, the district court found that both parts of

the *Hughes* test were satisfied. At the hearing, conducted by a magistrate, three scientific experts testified for the prosecution, and one for the defense. Defendant's expert introduced testimony down playing the risk posed by the imported fish. *Id.*, 106 S.Ct. at 2449–50. The government's testimony showed, however, that imported bait fish would endanger Maine's indigenous fish populations by introducing certain parasites. The evidence further indicated that non-native species inadvertently included in shipments of live bait fish threatened to disturb the state's aquatic ecology. *Id.* at 2449. Prosecution experts further testified that physical inspection of imported fish was a "physical impossibility." According to the experts, there were no scientifically accepted statistical sampling and inspection procedures for bait fish. *Id.* at 2449–50.

Based on the evidence, the magistrate concluded that the *Hughes* test had been satisfied and recommended dismissal of the indictment. The district court agreed, finding that Maine had demonstrated a legitimate and substantial purpose for the import ban and that less discriminatory means of achieving this purpose were currently unavailable.

The United States Court of Appeals for the First Circuit reversed. The court of appeals noted that Maine was the only state to bar importation of live bait fish, that the state permitted interstate shipment of other freshwater fish, subject to inspection, that an "aura of economic protectionism" surrounded certain statements made by state officials concerning a proposal to repeal the ban, and finally, that parasites and non-native species had other means of reaching Maine. *Maine v. Taylor*, 752 F.2d 757, 761–62 (1st Cir.1985). Accordingly, the court of appeals reversed defendant's conviction.

The Supreme Court reversed the court of appeals. The Court began by admonishing courts of appeals that they are not to decide issues of fact and should not set aside findings of fact made by the trial judge unless clearly erroneous. The Court noted that although local discrimination against

interstate commerce is subject to "strictest scrutiny," "the empirical component of that scrutiny, like any other form of factfinding, 'is the basic responsibility of district courts, rather than appellate courts.'" *Maine v. Taylor*, 106 S.Ct. at 2451, *quoting DeMarco v. United States*, 415 U.S. 449, 450, 94 S.Ct. 1185, 1186, 39 L.Ed.2d 501 (1974). The Court found that the question of whether scientifically accepted techniques existed for sampling and inspection of live bait fish was one of fact. The Court further found that the district court's findings that such techniques had not been devised could not be characterized as clearly erroneous. The Court noted that defendant's expert never argued that alternative sampling and inspection procedures existed but only that such procedures could be "easily developed." The Court agreed with the district court that "the 'abstract possibility' ... of developing acceptable testing procedures, particularly when there is no assurance as to their effectiveness, does not make those procedures an '[a]vailable ... non-discriminatory alternativ[e]' ... 'for purposes of the Commerce Clause." *Id.*, 106 S.Ct. at 2452–53, *quoting Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). The Court concluded that:

a state must make reasonable efforts to avoid restraining the free flow of commerce across its borders, but it is not required to develop new and unproven means of protection at an uncertain cost.

*Id.*, 106 S.Ct. at 2453. The Court further held that what the district court found to be legitimate justifications advanced by the state in support of the rate regulation did not lose legitimacy by virtue of what the court of appeals found to be signs of "protectionist intent":

Shielding in-state industries from out-of-state competition is almost never a legitimate local purpose, and state laws that amount to "simple economic protectionism" consequently have been subject to a "virtual *per se* rule of invalidity." ... But there is little reason in this case to believe that the legitimate justifications the State has put forward for its statute

are merely a sham or a "*post hoc* rationalization."

*Id.* at 2453–54 (citations omitted). The Court found that the official statements suggesting a protectionist motive behind the legislation were made after the enactment of the statute, and thus constituted weak evidence of legislative intent. *Id.*

In support of their argument that the manufacturing requirement violates the Commerce Clause, plaintiffs place great emphasis on the Act's legislative history, which, they argue, clearly illustrates the protectionist motive behind the legislation. Plaintiffs note that the gambling reform legislation introduced by Rep. Joseph Quinn in the 1990 session did not, in its original form, include a manufacturing requirement. Rather, plaintiffs argue that the genesis for the idea was a February 1990 visit by Governor Rudy Perpich and the Commissioner of the Iron Range Resources and Rehabilitation Board to a pull-tab manufacturing plant in the state of Washington. Following the visit, the St. Paul Pioneer Press Dispatch reported on the visit on the front page as follows:

In Lynnwood, Washington, a Seattle suburb, Perpich and Jack DeLuca, Commissioner of the Iron Range Resources and Rehabilitation Board, toured the plant of Trade Products, Inc., the largest manufacturer of pull-tabs in the United States. For that 400–employee company, manufacturing pull-tabs for 28 states is a $28 million business annually.

It's business that DeLuca believes should be in the state. "Why not do it in Minnesota" he said.

DeLuca said the effort is in its early stages, but the state is interested in getting a firm to produce pull-tabs locally, rather than send all the money out of state.

Baker Aff. Exh. B. According to the report, "the lawmaker said Monday that Perpich's query may be part of an effort that is brewing to centralize the manufacture and distribution of pull-tabs in the state." *Id.*

Two days later, the Governor announced that he would seek a manufacturing re-

quirement. The St. Paul Pioneer Press, reported the proposal as follows:

> Perpich, who has been investigating the prospects of locating a pull-tab manufacturing plant on the Iron Range, said he doesn't see any reason why this state should send the money to buy pull-tab games out of state.
>
> "You've got the paper here," Perpich said, "the ink's here, the glue's here, transportation, all that. And good paying jobs."

Baker Aff. Exh. C. Quinn is quoted in the same article as stating his view that the "centralized operation would be easier to regulate and make it harder for anyone to cheat." *Id.* The article then repeats De-Luca's statement that he wants to bring jobs to the Iron Range.

Plaintiffs also attach a transcript of committee discussions concerning the bill. Plaintiffs cite excerpts indicating that the justifications offered in support of the bill concerned both regulation aspects and anticipated economic benefits. As defendant Thomas Anzelc, Director of the Gambling Control Division, testified before the House Tax Committee:

> The amendment that you have before you, in my view, will address the problem of product security. It could eliminate problems relative to contraband product coming to Minnesota. It could eliminate unstamped, untaxed products from being in circulation in Minnesota. And certainly, from a purely economic development vantage point [the amendment] would be attractive to the citizens of the state.

Baker Aff. Exh. D, Tr. at 38.

In response to questions from committee members regarding whether the amendment violates the Commerce Clause, Rep. Quinn responded:

> I don't know the constitutionality. I can't answer your question.

*Id.* Tr. at 55. After Rep. Kathleen Blatz expressed concerns about the constitutionality of the amendment, Rep. Quinn stated:

> [I]f this is unconstitutional, those manufacturers have so damn much money that they will challenge it so quickly.

*Id.* Tr. at 57–58. Following this discussion, the amendment was added to the gambling bill on a 19 to 11 vote, and approved by the House on the following day.

As finally submitted to the governor for signature, the gambling reform bill contained the following legislative finding:

> The legislature finds and determines that, because of (1) the difficulty of ensuring the security and integrity of pull-tabs when they are manufactured in another state, and (2) the enhanced inspection and regulation of the manufacture of pull-tabs and the consequent enhancement of their security and integrity that would result from their manufacture in Minnesota, it is necessary and desirable that all pull-tabs sold in the state after June 30, 1992 be required to be manufactured in Minnesota.

Ch. 590, Art. I, Sec. 54.

Plaintiffs argue that the statute does not survive the strict scrutiny to be applied to statutes which are discriminatory on their face. In relation to the purpose, plaintiffs first stress the protectionist intent to be discerned from the hearing transcripts and public statements issued by Governor Perpich and Commissioner DeLuca and contend that the law lacks a legitimate local purpose. Plaintiffs argue that the reasons for the legislation contained in the "legislative finding" are not conclusive evidence of the Legislature's intent. *See Hughes v. Oklahoma*, 441 U.S. at 336, 99 S.Ct. at 1736 ("when considering the purpose of a challenged statute, this Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law," *quoting LaCoste v. Louisiana Department of Conservation*, 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)). *See also, Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 476 n. 2, 101 S.Ct. 715, 730 n. 2, 66 L.Ed.2d 659 (1981) (Powell, J., concurring in part) ("a court is empowered to disregard a legislature's statement of purpose if it considers it a pretext").

Plaintiffs, however, focus more on the second prong of the strict scrutiny test, the

alternative means requirement, rather than the legitimate local purpose element. Plaintiffs argue that there is no reason to suppose that Minnesota manufactured pull-tabs would be any more free of impropriety than those manufactured out of state, and stress that the goal of achieving conformity with Minnesota regulations can be equally well achieved by out-of-state inspections. It is undisputed that Minnesota law authorizes state inspectors to inspect pull-tab manufacturing facilities beyond the state's borders. Plaintiffs argue that to insure adequate inspection of out-of-state facilities, the state need only hire additional inspectors. Plaintiffs quote legislative testimony by the gambling control division head indicating that the industry is "unregulated because there aren't enough regulators." Baker Aff. Exh. D, Tr. at 36. Rep. Quinn testified that "we don't have somebody to go around the country and check sixteen different manufacturers." *Id.* at 8. Plaintiffs note, however, that the day before the manufacturing requirement was enacted, the Legislature appropriated $1.3 million for the Department of Gaming for twenty-four new positions. Plaintiffs argue that administrative ease or convenience is no excuse for state regulatory measures which discriminate against interstate commerce.

Plaintiffs rely upon the Supreme Court's decision in *Dean Milk v. City of Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). In *Dean Milk,* a Wisconsin municipal ordinance forbade the sale of milk as pasteurized unless the milk had been processed and bottled at an approved pasteurization plant within five miles from the center of the city. Another section prohibited the sale of milk, or the importation, or receipt or storage of milk for sale in the city unless from a source of supply possessing a permit issued after inspection by city officials. The Court first noted that the enactment was a valid exercise of the state's police power, and that the law was clearly motivated by valid health concerns. *Id.* at 353, 71 S.Ct. at 297. However, since the regulation excluded from distribution in the city wholesome milk produced and pasteurized in Illinois, the act erected an eco-nomic barrier protecting a major local industry against competition and in so doing "plainly discriminates against interstate commerce." *Id.* at 354, 71 S.Ct. at 298. The Court held:

> This it cannot do, even in the exercise of its unquestioned power to protect the health and safety of its people, if reasonable nondiscriminatory alternatives, adequate to conserve legitimate local interests, are available.

*Id.* at 354, 71 S.Ct. at 298. The Court found that reasonable and adequate alternatives were available in that the city, if it preferred to rely upon its own inspectors, could have its inspectors conduct such inspection at distant milk sources, and could charge the actual and reasonable cost of such inspection to the importing producers and processors. *Id.* at 354–55, 71 S.Ct. at 297–98. The Court also noted that an alternative had been proposed which would have required milk sold in the city to have been produced and pasteurized in conformity with standards determined by the city, even if produced and pasteurized in other states. The Court noted that the city health commissioner had testified that under either system Madison consumers would be safeguarded adequately and expressed no preference. *Id.* at 356, 71 S.Ct. at 299. The Court also stated that an ordinance is not valid "simply because it professes to be a health measure." *Id.* at 354, 71 S.Ct. at 298. If it were, the Commerce Clause would be unable to reach discriminatory state action "save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Id.*

Plaintiffs argue that as in *Dean Milk,* the avowed purpose of the legislation at issue here can be accomplished by inspection of pull-tab manufacturing plants outside the state of Minnesota, including, imposition of the costs of such inspection on the regulated industry. Plaintiffs distinguish *Maine v. Taylor,* stressing that in regard to the inspection of out-of-state pull-tab manufacturing plants, there is no issue of technological feasibility as appeared to be controlling in the *Maine v. Taylor* deci-

sion. Plaintiffs argue that defendants have not met their burden of proving the absence of less discriminatory alternative means of regulating the pull-tab industry.

The Court finds that the state has failed to prove the necessity of the manufacturing requirement to accomplish the objective of monitoring compliance with Minnesota pull-tab regulations in the manufacture of pull-tab equipment. The Court finds the evidence of discriminatory motive here extremely compelling, and the justification offered in support of the legislation weak at best. The Court agrees that *Maine v. Taylor* is distinguishable. In *Maine v. Taylor*, a clearly controlling concern of the Court was the unavailability of feasible technological alternatives to the import ban. Here, the state merely seeks to avoid the cost of sending its investigators beyond the state's borders to inspect pull-tabs destined for the state. According to the record before the Court, at present there are only twenty manufacturing plants currently supplying pull-tabs to the Minnesota market. The state has offered no evidence that inspection of pull-tab manufacturing plants outside of Minnesota could not be reasonably accomplished at a reasonable cost. Thus it does not appear to be an undue burden to send Minnesota inspectors beyond the state's borders to inspect goods bound for the state. Moreover, even had the defendants shown some significant cost-savings attending the manufacturing requirement, defendants cite no support for the theory that lower inspection costs alone justifies banning the sale of regulated goods manufactured outside of the state's borders. Were the state's duty to show justification for such radical economic isolationism so easily met, the impact on interstate commerce could be extreme.

This case is far from *Maine v. Taylor*, and much closer to *Dean Milk*. The economic protectionism which is so evident here is precisely the evil which the Commerce Clause was designed to prevent. The Court finds that the manufacturing requirement clearly violates the Commerce Clause, and should be declared unconstitutional.

## II. Whether the Requirement that Pull–Tabs be Labeled "For Sale in Minnesota Only" Violates the Commerce Clause

■ Plaintiffs argue that the requirement that pull-tab products be labeled "For Sale in Minnesota Only" is subject to the same strict scrutiny as must be applied to the manufacturing requirement.[4]

Defendants argue that the "For Sale in Minnesota Only" labeling requirement (hereinafter labeling requirement) is not subject to strict scrutiny but rather, since it has only an incidental burden on interstate commerce, is valid unless the burdens imposed are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Defendants argue that the labeling requirement is not discriminatory because it applies equally to both pull-tabs manufactured in Minnesota and those manufactured outside of Minnesota. In other words, all pull-tabs sold in Minnesota, wherever manufactured, must be labeled "For Sale in Minnesota Only." Defendants contend that this labeling requirement will enable Minnesota inspectors to immediately identify pull-tabs in the manufacturer's possession intended for sale in Minnesota, and will prevent inspectors from wasting their time inspecting stock intended for another market. Accordingly, labeling will make inspections, according to defendants, more efficient, less time consuming, less expensive, and less resource-intensive. Defendants note that the labeling requirement is similar in effect to various other regulations not challenged by plaintiffs, including the regula-

---

4. Defendants admit that the second labeling requirement, that is, that after June 1991, pull-tabs be labeled "Manufactured in Minnesota For Sale in Minnesota Only" is meaningless without the manufacturing requirement so that this labeling requirement stands or falls along with the manufacturing requirement. In view of the Court's finding that the manufacturing requirement is unconstitutional, it necessarily follows that the requirement that pull-tabs be labeled "Manufactured in Minnesota For sale in Minnesota Only" falls as well.

tion that manufacturers print on each pull-tab the following statements:

> Pull-tab (or tip board) purchasers—this pull-tab (or tip board) game is not legal in Minnesota unless:—a Minnesota gambling stamp is affixed to this sheet, and —the serial number handwritten on the gambling stamp is the same as the serial number printed on this sheet and on the pull-tab (or tip board) ticket you have purchased.

Minn.Stat. § 349.163, subd. 5(c). Defendants contend that the label "For Sale in Minnesota Only" no more burdens manufacturers than does the above quoted requirement which is not challenged by plaintiffs. According to defendants, the minor burdens imposed by the labeling requirement are clearly not excessive in relation to the benefits to inspectors resulting from them.

Plaintiffs argue that this labeling requirement adds nothing to existing laws preventing the sale of unregistered pull-tabs in Minnesota. Plaintiffs argue that even if less than strict scrutiny applies, the labeling requirement is unconstitutional because the regulation has no local benefit and indeed is "pointless." Plaintiffs argue that if the state is truly interested in preventing inspectors from wasting time inspecting stock intended for another market, inspectors could simply inspect the stock once it arrives in Minnesota. (This argument, of course, also additionally refutes defendants' arguments in support of the manufacturing requirement.) Plaintiffs contend that the "For Sale in Minnesota Only" label severely burdens pull-tab manufacturers by preventing pull-tabs so labeled from being sold in any other state. Plaintiffs supply an affidavit by T. Keith O'Neill, president of plaintiff International Gamco, Inc. O'Neill states that compliance with the labeling requirement will require his company to segregate inventory destined for Minnesota, thereby necessitating added space and labor. In addition, O'Neill complains that the law would make it impossible to respond to market fluctuations by diverting pull-tabs originally destined for Minnesota to another state. Affidavit of T. Keith O'Neill ¶ 4. An affidavit of

Ronald G. Rudy, president of plaintiff Trade Products, Inc., makes the same claim. Affidavit of Ronald G. Rudy ¶ 4.

The Court finds that the labeling requirement is not facially discriminatory in that it applies equally to pull-tabs manufactured both in Minnesota and beyond. Therefore, the lesser degree of scrutiny outlined in the *Pike* decision is applicable. Under this standard of analysis, the Court must examine whether the burdens imposed by the labeling requirement on interstate commerce are clearly excessive in relation to the benefits accruing to the state in regulating pull-tab manufacturing. *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. In conducting this analysis, the Court must consider whether the state's interest could be otherwise promoted "as well with a lesser impact on interstate activities." *Id.* Defendants rely upon *Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981), in which the Supreme Court considered whether a Minnesota statute banning the retail sale of milk in plastic non-returnable, non-refillable containers violated the Clause. The Court found that the statute regulated even-handedly because the statute prohibited the sale of such containers regardless of where the milk was produced, and accordingly, applied the *Pike* analysis. The Court found that the burden on commerce attending the regulation was relatively minor, and the state's interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems "substantial." Further, the Court found that alternative schemes suggested by opponents of the statute were either more burdensome on commerce than the act or less likely to be effective.

The Court finds that the labeling requirement at issue in this case fails the test set forth in *Pike v. Bruce Church*. As noted above, it is beyond serious dispute that protectionist motives infected the Legislature's consideration of the 1990 amendments, including the labeling requirement. Plaintiffs argue, with some force, that the "For Sale in Minnesota Only" labeling requirement was intended to be only the first

phase in transition to a regulatory scheme based on total isolation and protection of the Minnesota pull-tab manufacturing industry. Plaintiffs argue that the "For Sale in Minnesota Only" labeling requirement was intended to discourage out-of-state manufacturers from doing business in Minnesota in the period before the manufacturing requirement took effect. Plaintiffs note that Minn.Stat. § 349.163, subd. 3(a)(5) on its face purports to make illegal the sale of a pull-tab labeled "For Sale in Minnesota Only" to any entity which is not a licensed distributor.[5] Thus, plaintiffs argue that pull-tabs initially intended for sale in Minnesota, and labeled accordingly, would have to be relabeled should the manufacturer elect to divert the pull-tab to a different state.

The state makes no attempt to refute the plaintiffs' burden claims, resting instead on its claim that the regulatory benefits justify whatever burden might exist. The state, moreover, is silent with respect to the availability of less burdensome alternatives, an element necessary to the *Pike* analysis. Defendants do not concede but have not disputed plaintiffs' contention that the state's interest in limiting its inspection to pull-tabs intended for sale in Minnesota can be adequately accomplished by deferring inspection until the pull-tabs reach this state. Moreover, it appears that other less burdensome alternatives suggested by plaintiffs such as labeling the pull-tabs "For Sale in Minnesota," leaving out the word "Only," would make resale of unused Minnesota-destined pull-tabs more commercially practicable, in that removal of the word "Only" removes the appearance that the pull-tab is illegal in other states.[6] Plaintiffs also suggest that inspectors limit their inspections to those pull-tabs affixed with the Minnesota gambling stamp. In this manner, Minnesota inspectors could confine their inspections to those goods destined for Minnesota, the precise aim sought to be accomplished by the labeling requirement. The Court finds that in light of the numerous alternative means for conducting efficient inspections presented to the Court, and the obvious protectionist motives underpinning the 1990 legislative process, the labeling requirement set forth in Minn.Stat. § 349.163, Subd. 3(a)(3), based on the analysis set forth in *Pike v. Bruce Church,* violates the Commerce Clause of the United States Constitution.

### III. *Whether the Return Requirement Violates the Contract Clause of the United States Constitution*

Plaintiffs argue that subdivision 6 of the 1990 amendments violates Article I, Section 10 of the United States Constitution by retroactively imposing the obligation upon pull-tab manufacturers to reimburse customers for the cost of pull-tabs determined not to conform with regulations announced after the pull-tabs were sold. The parties agree that under the Contract Clause, if the state law operates as a "substantial" impairment of a contractual relationship, the state must show "a significant and legitimate public purpose behind the regulation ... such as the remedying of a broad and general social or economic problem." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983). Defendants contend, however, that the law does not impose upon manufacturers the obligation to reimburse customers for the cost of the non-conforming items, but merely obligates them to accept returns of the items. The statute in question reads as follows:

> Authorized employees of the board, the division of gambling enforcement of the department of public safety, and the commissioner of revenue may remove gambling equipment from the inventories of distributors and organizations and test that equipment to determine its compliance with all applicable laws and rules.

---

**5.** Minn.Stat. § 349.163, subd. 3(a)(5) provides that "a manufacturer may not ... sell a pull-tab marked as required in paragraphs (3) and (4) to any person inside or outside the state ... who is not a licensed distributor."

**6.** Minn.Stat. § 349.163, subd. 3(a)(5) could also be clarified to allow resale of Minnesota-labeled pull-tabs in other states.

*A distributor or organization may return to the manufacturer thereof any gambling equipment which is determined to be in violation of law or rule....*

Minn.Stat. § 349.162, subd. 6 (emphasis added).

Interpreting this provision not to require reimbursement to customers of the cost of the returned pull-tabs, defendants argue that the regulation imposes no more than a minimal burden to accept returns of the goods and to dispose of them accordingly. Plaintiffs respond that so interpreted, the statute "may be constitutional." Plaintiffs' Reply Memorandum at 2. Plaintiffs note, however, that the administrator charged with enforcing the requirement has interpreted the provision to require reimbursement. In support of this claim, plaintiffs supply the following statement by defendant Anzelc:

> Removal of equipment from inventory (M.S. 349.162 Subd. 6) A distributor or organization can return equipment which they believe is in violation of rule or statute before the state has formally made that determination. However, the manufacturer is under no obligation to accept or give a refund until the state formally declares that the equipment is not in compliance.

Baker Aff. Exh. F, at 2. The statement is contained in a legislative summary prepared by Anzelc.

The Court finds defendants' proffered interpretation of the return requirement implausible. Director Anzelc's interpretation set forth in the legislative summary cited above reflects a common-sense reading of the plain language of the statute. It is unlikely that the Legislature would have found it necessary to inform organizations and distributors that they may return unusable merchandise without compensation. Moreover, the Court notes that subdivision 6 as a whole appears to address the general topic of how costs incurred by organizations and distributors relating to gambling

inspections can be absorbed. The subdivision, for example, specifies that the cost of gambling equipment removed from inventory and found to be *in compliance* with the law constitutes an allowable expense under Minn.Stat. § 349.15 specifying permissible uses of gross profits. In this context, it is reasonable to interpret the return requirement as providing the manner in which organizations and distributors may be reimbursed for the cost of gambling equipment found *not* to be in compliance. For these reasons, the Court interprets Minn.Stat. § 349.162, subd. 6, as requiring manufacturers to reimburse organizations or distributors for the cost of gambling equipment determined to be in violation.

The Court further finds, however, that even so interpreted the provision does not violate the Contract Clause of the United States Constitution. First, plaintiffs have not demonstrated the extent to which the requirement that manufacturers reimburse their customers for the cost of non-conforming equipment constitutes a substantial modification of the manufacturer's contractual rights. Plaintiffs have introduced no evidence concerning the amount of goods presently in circulation which will be rendered commercially unsalable by virtue of the 1990 legislation,[7] nor the precise costs associated with bringing any such non-conforming goods into conformity with current law. Plaintiffs' arguments focused almost exclusively on labeling requirements which the Court today declares unconstitutional. Thus, the Court has little evidence upon which to base the conclusion about the practical effect of the return requirement as it may relate to other regulations.

Secondly, and perhaps more importantly, the Court notes that gambling in Minnesota is an intensively regulated industry, and that manufacturers of products involved in the gambling industry must necessarily expect a certain degree of disruption of their contractual arrangements resulting from such regulation. *See Energy Reserves*

---

7. The 1990 legislation includes a number of provisions other than those found unconstitutional here which could have the effect of invali-

dating pull-tab products presently in distribution. *See, e.g.,* Minn.Stat. § 349.163, subd. 5.

*Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) ("in determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past"); *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 242 n. 13, 98 S.Ct. 2716, 2721 n. 13, 57 L.Ed.2d 727 (1978); *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908). Moreover, even were it shown that the return requirement imposed a substantial impairment of manufacturers' contractual expectations, the Court would find that the state's interest in tightly regulating the gambling industry adequately justifies the requirement. Requiring manufacturers to reimburse customers for the cost of goods made commercially unsalable by regulation encourages those holding illegal pull-tab equipment to return such equipment for full credit rather than attempt to recoup their investment through improper use or distribution. Having determined that pull-tab equipment presently in circulation is inadequate to ensure the integrity and security of the gambling industry, it was within the Legislature's prerogative to impose the cost of new regulation upon manufacturers, which should reasonably expect and plan for such state regulation, rather than distributors or other organizations, such as fraternal, religious, veterans or other nonprofit organizations, which the gambling proceeds are intended to benefit. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), relied upon by the plaintiffs, is not on point. As the Court noted in holding unconstitutional a pension funding charge imposed upon companies attempting to close their Minnesota operations, the Minnesota Legislature had not previously sought to engage in such regulation. *Id.* at 249–50, 98 S.Ct. at 2724–25. Here, by contrast, the plaintiffs in this case have

voluntarily injected themselves into an intense regulatory environment. As the Court noted in *Veix v. Sixth Ward Building and Loan Association,* 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940), *quoted in Allied Structural Steel,* 438 U.S. at 242–43 n. 13, 98 S.Ct. at 2721–22 n. 13:

> When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.

*See also Energy Reserves Group, Inc.,* 103 S.Ct. at 704. In light of the history of pervasive regulation of the gambling industry in Minnesota and the absence of a clear record indicating the impact of the requirement upon manufacturers' contractual expectations, the Court finds that the return requirement, interpreted to require manufacturers to reimburse customers for the cost of non-conforming merchandise, does not violate the Contract Clause of the United States Constitution.[8]

## CONCLUSION

Based upon the foregoing, and upon all the files, records and proceedings in this case,

IT IS ORDERED that:

1. plaintiffs' motion for summary judgment is granted in part and denied in part;

2. defendants' motion for summary judgment is granted as to Count II of plaintiffs' complaint regarding the return requirement;

3. the following statutes are hereby found to violate the Commerce Clause of the United States Constitution: Minn.Stat. § 349.163, subd. 3(a)(3), (4), (5); Minn.Stat. § 349.163, subd. 3(b); and Minn.Stat. § 349.162, subd. 1(b) and (c);

> It appears, however, that plaintiffs do not assert these grounds in relation to the return requirement. Thus, in view of the Court's disposition of plaintiffs' other claims as outlined above, it is unnecessary to address these alternative grounds.

---

**8.** In response to plaintiffs' motion, defendants seek summary judgment in their favor on plaintiffs' fourteenth amendment equal protection argument made in Count III of the complaint as well as plaintiffs' claim that the challenged legislation violates the privileges and immunities clause of the Constitution, Article IV, Section 2.

4. defendants are hereby permanently enjoined from enforcing the statutes cited above or any regulations based thereon.

LET JUDGMENT BE ENTERED ACCORDINGLY.