**Gary and Linda ALLEN, Durst Brothers Dairy Farm, a Minnesota partnership, Armin H. Schrimpf, Stehr Farm, Inc., a Minnesota corporation, Duane Winhorst, Curtis Schrimpf, Kenneth Schrimpf, Ridgeway Enterprises, Inc., a South Dakota corporation, d/b/a Dairyridge, Plaintiffs,**

v.

**STATE OF MINNESOTA and Elton R. Redalen, Commissioner of Minnesota Department of Agriculture, Defendants.**

**LE SUEUR CHEESE COMPANY, Plaintiff,**

v.

**Elton R. REDALEN in his official capacity as Commissioner of the Minnesota Department of Agriculture, Defendant.**

**Civ. Nos. 3:94–CV–00639, 3:94–CV–00768.**

United States District Court, D. Minnesota, Third Division.

Nov. 14, 1994.

Doherty, Rumble & Butler Professional Ass'n and Michael R. Docherty, Sunday Prchal and Mark Hanson, for and on behalf of plaintiffs Allen, Durst, et al.

Robins, Kaplan, Miller & Ciresi and Annamarie A. Daley, Elliot Kaplan and David Bush, for and on behalf of plaintiff Le Sueur Creamery.

Office of the Minnesota Atty. Gen., and Paul A. Strandberg, for and on behalf of defendant Elton R. Redalen.

DAVIS, District Judge.

This matter came before the court on August 18, 1994 on plaintiff's motion for a permanent injunction in an action challenging, *inter alia,* the constitutionality of Minn.Stat. § 32.11 (Supp.1993) as interpreted by the defendants State of Minnesota and the Commissioner of the Minnesota Department of Agriculture (collectively the "State") to prohibit the payment of premiums based on the quantity of milk produced on a periodic basis.[1] The State interprets the statute to

1. Minn.Stat. § 32.11(a) provides:

(a) Any person, firm, copartnership, or corporation engaged in the business of buying milk, cream or butterfat for manufacture or for sale of such milk, cream, or butterfat, who shall discriminate between different sections, between persons in the same section, locality, community or city of this state, by purchasing such commodity at a higher price or rate from one person or in one locality than is paid for the same com-

prohibit variations in the prices paid by manufacturers, creameries, processors and other purchasers of milk products when those variations are based on factors other than transportation costs or factors based on quality. *See,* Minn.Stat. § 32.25 (Supp.1993).[2]

Plaintiffs have previously been before this court seeking to temporarily enjoin the State from enforcing Minn.Stat. §§ 32.11 and 32.25 to prohibit volume premiums. This court, by Order dated July 3, 1994, granted plaintiffs' motion and set the matter on for hearing on the merits. The court here finds that Minn. Stat. §§ 32.11 and 32.25 as interpreted by the State, imposes an undue burden on interstate commerce in violation of the Commerce Clause of the United States Constitution, Art. 1, § 8, cl. 3 and the Contract Clause, U.S. Const., Art. 1, § 10, cl. 1.

I.

The "Allen" plaintiffs are a group of dairy farmers who have received "volume premiums" from purchasers of their dairy products in the past. The producers of the milk products and the purchasers of milk favor this arrangement because the payments constitute an economic incentive for the dairymen to efficiently produce large quantities of milk from their herds. Plaintiff Le Sueur Creamery, a processor of milk products, favors the practice because it is possible for it to acquire the large quantities of milk on a cost efficient basis. Purchasing the milk in great quantities permits it to operate its processing plants at full capacity, thus lowering their fixed operating costs and, by extension, the costs of their products.

The State asserts that the practice of awarding volume premiums violates the prohibition against price discrimination contained in Minn.Stat. § 32.11. The State denies that the enforcement of such prohibition has any impact on interstate commerce or that the impact is so minuscule in relation to the benefits derived therefrom. In brief, the State contends that the prohibition of volume premiums is a reasonable and constitutional means of a legitimate state interest; the preservation of its declining small and family dairy industry.

A. The Dairy Industry in Minnesota

Minnesota has approximately 13,000 dairy farms, with an average herd size of 48 cows. The average cow produces some 49 pounds of milk per day for ten months a year. In 1990, over 44 per cent of the milk produced in the state was produced on farms having 50–99 cows. (Affidavit of Donald E. Adult at 2.)

It has become highly economical for dairy processors to transport milk from the farm to the processing facility and the practice of volume premiums grew out of the economies of this transport arrangement. Milk is highly perishable and cannot be stored for long periods. *Id.* at 3. It is cheaper to pick up and transport a single large quantity of milk than it is to provide the same service involving many small quantities.

Plaintiffs estimate that volume premiums are received by over half of the dairies in the state of Minnesota. They assert that farms with as few as 15 cows producing 20,000 pounds of milk per month qualify for volume premiums. *Id.* at 4–5.

The impact of the Minnesota dairy industry on the national dairy industry is also

modity by such person, firm, copartnership or corporation in the same locality or in another locality, after making due allowance for the difference, if any, in the reasonable cost of transportation from the locality of purchase to the locality of manufacture or locality of sale of such milk, cream, or butterfat, shall be deemed guilty of unfair discrimination, which is a misdemeanor.

2. Minn.Stat. § 32.25, Subd. 1 (Supp.1993) provides:

Milk must be purchased from producers using a formula based on one or more of the following:

(1) payment of a standard rate with uniform differentials for milk testing above or below 3.5 percent milk fat;
(2) payment of a standard rate for the pounds of milk fat contained in the milk;
(3) payment of a standard rate for the pounds of protein in the milk;
(4) payment of a standard rate for the pounds of solids, not fat, contained in the milk; or
(5) payment of a standard rates based upon other attributes of value in the milk.

In addition, an adjustment may be made on the basis of milk quality and other premiums.

involved in the analysis undertaken by both the Allen and Le Sueur plaintiffs. Due to the pervasive influence of the Federal government in establishing prices paid for milk and the maintenance of minimum prices, see, 7 U.S.C. §§ 601–674, the prices paid for milk produced in Minnesota and Wisconsin determine the prices paid for milk in 48 states through a mechanism known as the M–W price series.[3] The M–W price series ties the basic price paid for milk in 48 states to the "average price per hundred weight for manufacturing grade milk, f.o.b. plants in Minnesota and Wisconsin, as reported to the Department [of Agriculture] for the month . . .". *See, e.g.,* 7 C.F.R. §§ 1002.51, 1068.51 and *Minnesota Milk Producers Association v. Yeutter,* 851 F.Supp. 1389, 1391–92 (D.Minn. 1994).

In March or April 1994, the Minnesota Department of Agriculture (Department) became aware that certain dairy processors were offering volume premiums to Minnesota dairymen. After consultation with the Minnesota Attorney General's office, the Department caused a memorandum to be sent to "Purchasers of Producer Milk". (Affidavit of Michael Docherty, Exhibit 3.) In that memorandum, purchasers in Minnesota as well as in other states, were advised that volume premiums were "not provided for under Minnesota law" and requested an immediate cessation of the practice. In response to a variety of inquiries concerning the extent of the prohibition, the Department clarified its intentions in an additional memorandum dated March 30, 1994 and addressed to "Purchasers of Raw Milk from Minnesota Dairy Farmers." In that memorandum, the Department threatened to assess a $1,000 a day administrative penalty against "Minnesota *and* non-Minnesota milk purchasers purchasing milk from Minnesota Producers who continue to offer an illegal volume-based premium." *Id.* Exhibit 2. (Emphasis in original.)

B. The Allen Plaintiffs

Plaintiff Durst Brothers Dairy Farm ("Durst Brothers") is located in Kasson, Minnesota. The farm has been in operation for approximately 16 years and produces some 13 million pounds of milk per year. Durst Brothers has received volume premiums from the dairy plant known as Associated Milk Producers, Inc. ("AMPI") for approximately fourteen years. (Amended Affidavit of Rolland E. Durst.)

Based on their receipt of volume premiums, Durst Brothers has expanded its operation. Durst Brothers purchased larger storage facilities and made several improvements in its operation to improve efficiency. Durst Brothers borrowed money from Farm Credit Services to finance the expansion. Without the additional income from the receipt of volume premiums, Durst Brothers will lose approximately $60,000 to $70,000 per year and will be unable to meet its financial obligations. Durst Brothers states it cannot remain a viable operation without the payment of volume premiums. *Id.* at 2–4.

Durst Brothers attempted to export its milk to Iowa when confronted with the loss of volume premiums in Minnesota. It was told that processors in Iowa had been threatened by the State of Minnesota with penalties if they continued the practice of offering volume premiums to Minnesota producers. As a result of the threat of criminal sanctions, Iowa processors ceased offering volume premiums to Minnesota milk producers. Id. at 4.

Plaintiff Ridgeway Enterprises (Ridgeway) operates a dairy farm in Todd County, Minnesota. The farm produces approximately sixteen million pounds of milk per year. Ridgeway has entered into various financial arrangements with both dairies and banks predicated on the receipt of volume premiums. Ridgeway is now threatened with the loss of some $100,000 if volume premiums are prohibited. (Affidavit of James Ridgeway at 3.)

When Ridgeway was notified that the State intended to prohibit volume premiums, it began looking for out-of-state milk processors who might offer volume premiums in an effort to mitigate some of its losses.

3. California is not subject to the M–W price series. California, the largest producer of milk in the nation is not subject to a federal milk pricing order.

Ridgeway found a processor in South Dakota who offered to pay volume premiums and Ridgeway made plans to ship its milk to South Dakota. Before the agreement could be finalized however, Ridgeway was informed by the South Dakota processor that it had received a notice from the state of Minnesota threatening to assess penalties if Minnesota milk producers were paid volume premiums. The South Dakota processor withdrew the offer on that basis. *Id.* at 4.

C. The Le Sueur Plaintiff

Plaintiff Le Sueur Cheese Company is a processor of milk products, purchasing on an annual basis some 62,000 tons of milk from 233 producers in the upper Midwest. Approximately 60,000 tons of that milk is purchased from producers located in Minnesota. (Affidavit of Mark Davis at 2.)

Le Sueur has paid volume premiums to milk producers since 1979 and has entered into contracts with producers which contemplate the payment of such premiums. In 1993, Le Sueur paid approximately $177,000 in volume premiums to eighty five percent of its 233 producers. The ability to purchase large quantities of milk allows Le Sueur to operate its production facilities at near maximum utilization, allowing them to remain competitive in a labor and capital intensive business marked by extreme competition for limited and diminishing supplies of milk. *Id.* at 3.

Le Sueur states that its volume premium program assures it of adequate supplies of milk and posits that its costs would increase markedly if the volume premium program were discontinued. Moreover, it would have to replace those suppliers who sought higher prices elsewhere in the event that the volume premium programs were discontinued. In order to replace those suppliers, Le Sueur's direct and ancillary costs would increase and consequently, the wholesale and retail costs would increase for consumers of its products. *Id.* at 4.

D. The State of Minnesota

The statute prohibiting the price discrimination for milk has been part of the framework of agricultural regulation in the state of Minnesota since 1909. The predecessor of the statute challenged here was stricken as violative of the Contract Clause of the United States Constitution in *Fairmont Creamery Co. v. Minnesota,* 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893 (1927). *Fairmont Creamery* has never been overruled. Although the statute's prohibition against price discrimination was held void by the Court, it apparently was never repealed. In fact, in 1955 the Legislature amended Minn.Stat. 32.11.[4] The statute at issue here is, with minor modifications, the same statute stricken in 1927.[5]

Prior to 1984, milk prices were based solely on weight and butterfat content. In 1984, Minn.Stat. § 32.25 was amended to allow milk prices to reflect "other attributes of value" such as the quantity of non-fat milk

4. The statute was amended to prohibit discriminatory pricing not only between regions, but between persons in the same region; it was also amended to provide a violation constitutes a misdemeanor whereas the 1927 version established the manner of punishment as being a fine not exceeding $100 or by a jail term not to exceed 90 days; and the statute has been amended to provide for "reasonable" allowance for the cost of transportation rather than "actual" cost of transportation.

5. Indeed, the point of departure in plaintiffs' analysis is that this is the same statute that was stricken by the Court in 1927. Plaintiffs argue that by striking section 3907, the predecessor of section 32.11, the Court, in the absence of action by the Legislature, ended the juridical life of Minnesota's price discrimination statute. Defendant contends that the intervening years have given rise to a new analysis which, if properly applied, saves the statute in its current incarnation. The issue not addressed by defendant, however, is the effect of the decision made in 1927. Defendant seems to take the position that the state is somehow free to ignore the Court's declaration and, then, free to begin enforcing a statute after the decision has been largely forgotten or a new jurisprudential approach to the problem has been taken. This court is troubled by the simple fact that the predecessor statute was stricken as unconstitutional and, some 28 years later, amended in some minor and immaterial fashion and enforced as if nothing had ever happened. Because the court today determines that Minn.Stat. 32.11 violates the Contracts Clause under the current analysis utilized by the Supreme Court, this court does not reach this issue.

solids and protein found in the milk. (Affidavit of William W. Coleman at 2.)

The State admits that it was unaware that volume premiums were being offered and that the practice was growing increasingly widespread. There is credible evidence that volume premiums have been offered in Minnesota by milk processors since 1966. (Affidavit of Rudy Nef.) The State asserts the prohibition against price discrimination was enforced from 1955 until 1984, when budget constraints forced the State to abandon enforcement of the prohibition.

Since 1984, the State has failed to investigate compliance with, or enforce, the terms of Minn.Stat. § 32.11 either as it today interprets it or as it is written. Indeed, until March 1994, the State had no knowledge that volume premiums were being offered. Once the volume premiums were discovered, the State asserts it took immediate action to declare its interests by taking steps to prohibit the practice.

The State asserts that it has a legitimate interest in protecting and preserving its declining dairy industry, particularly its small family operated dairy farms. Minn.Stat. § 32.11, the State argues, serves as a prophylactic measure against predatory pricing practices which, if permitted, will allow larger purchasers of milk products to initially set high prices to obtain a disproportionate share of the produce of small farms and then could set ruinously low prices for milk, thus forcing smaller producers out of business. In addition, the State contends that its purpose in enacting and enforcing Minn.Stat. § 32.11, is to maximize the amounts of money available for the purchase of milk products such that all of the producers in the state are treated equally. It is the wish of the State that each of the producers in Minnesota will receive from the purchasers of its products remuneration based solely on the content of that product.

Plaintiffs have brought this suit claiming that 1) the statute has been declared unconstitutional and is therefore void and without effect; 2) that Minn.Stat. § 32.11 is an impermissible burden on interstate commerce; 3) that Minn.Stat. § 32.25 explicitly allows the payment of volume premiums; and, 4) that enforcement of Minn.Stat. § 32.11 constitutes a constitutionally impermissible impairment of contract. For relief, plaintiffs seek a declaration that Minn.Stat. §§ 32.11 and 32.25 are unconstitutional as interpreted by the State and a permanent injunction prohibiting the enforcement of such statute by the State.

## II.

The standard for the issuance of permanent injunctive relief is essentially the same as that applicable to the issuance of preliminary injunctive relief, except that the moving party must show actual success, rather than probable success, on the merits. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987).

The Eighth Circuit has established the following analysis to be used in considering whether to grant or deny a motion for injunctive relief:

> [W]hether a[n] injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *accord Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1090 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). The court balances the four factors to determine whether injunctive relief is warranted. *Dataphase,* 640 F.2d at 113; *West Publishing Co. v. Mead Data Cent. Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986). Plaintiffs bear the burden of proof as to each of the four factors. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987).

### A. THREAT OF IRREPARABLE HARM

Plaintiffs must prove that harm will result without injunctive relief and the harm will not be compensable with money damages. Possible or speculative harm is not enough. The absence of such a showing is

sufficient to deny a injunctive relief. *Gelco,* 811 F.2d at 420; *Roberts v. Van Buren Pub. Sch.,* 731 F.2d 523, 526 (8th Cir.1984) (citations omitted).

■ The court finds that the plaintiffs have met their burden with regard to the threat that they will suffer irreparable harm if the court denies their request for injunctive relief.

The Allen plaintiffs produce several hundreds of thousands of pounds of milk each year and have been, over the past fourteen years, recipients of hundreds of thousands of dollars in volume premiums. Durst Brothers, for example, undertook an expansion of their production facilities in reliance on the receipt of some $60,000 to $70,000 in volume premiums annually. Ridgeway contends that its operation stands to lose as much as $100,000 annually if the prohibition against volume premiums is enforced. Moreover, the plaintiffs have estimated that 60–70% of Minnesota's dairy farmers receive the volume premium. Expenditures of the size undertaken by Durst Brothers in reliance on its receipt of volume premium payments, and losses of the magnitude of those which will be sustained by plaintiff Dairyridge are not inconsequential. They are not the kinds of losses which can be easily remedied.

Plaintiff Le Sueur purchases some 60,000 tons of milk per year from Minnesota producers and has paid volume premiums since 1979. The threat of the prohibition of volume premiums has forced Le Sueur to look for other sources of milk as its Minnesota producers look to out-of-state purchasers that offer volume premiums to maximize their income. If the prohibition against the payment of volume premiums stands, Le Sueur contends that it will not be able to find supplies of local raw milk adequate to sustain its operations on an economically viable basis, because its purchasing and operating costs would necessarily rise due to the increased transportation costs and its inability to operated its processing machinery at full capacity. As a result, Le Sueur contends that its plant will not be viable.

Plaintiffs must be secure in their financial and economic projections. Having already relied upon the failure of the State to enforce Minn.Stat. § 32.11 for some fourteen years, it would be manifestly inequitable to allow the State to now unilaterally alter the status quo. Furthermore, because the court finds Minn.Stat. §§ 32.11 and 32.25 as enforced by the State violates the Commerce and Contract Clauses of the United States Constitution, as discussed in detail below, the impairment of plaintiffs' constitutional rights constitutes irreparable harm.

Finally, the court finds that the harm the plaintiffs are likely to suffer would be irreparable because it would not be compensable with money damages. The Eleventh Amendment to the United States Constitution would shield the State from an action to recover the volume premium payments made or damages incurred as a result of the enforcement of Minn.Stat. § 32.11. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974).

Accordingly, the court finds that plaintiffs have made a showing adequate to meet this prong of the *Dataphase* requirements.

B. THE BALANCE OF HARMS

■ The balance of harm must tip decidedly toward the plaintiffs to justify issuance of an injunction. *See e.g., General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 624 (8th Cir. 1987). Injunctive relief is not appropriate if the hardship to the defendant outweighs the hardship to the plaintiffs, should the injunction issue.

■ The plaintiffs are likely to lose thousands of dollars, if the court denies their request for injunctive relief. The State has failed to show that the hardships which it might suffer outweigh the hardships to be suffered by the plaintiffs.

The State argues that it has a strong interest in enforcing the statutes enacted by the Legislature and that the grant of the injunction will disrupt the "fair administration" of the State's extensive regulatory system. The State, however, has admittedly failed to enforce the provision at issue here for an extended period of time. *See e.g., Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1533 (9th Cir.1993). ("...

[T]here had already been a 'forbearance of enforcement of this regulation for a long time', implying that the City itself did not perceive enforcement of the regulation to be a matter of great urgency.") The preservation of the status quo in this matter will not have the disruptive effect predicted by the State, since the State has failed to enforce the statute for some fourteen or more years. During that time period, a large percentage (perhaps a majority) of the dairymen throughout Minnesota have participated in a volume premium program. Many of those milk producers, including the plaintiffs, have become dependant on the income derived from participation in volume premium programs and have ordered their financial affairs around that participation. The State has produced no evidence showing the court how the issuance of the relief requested here will harm the State or its interests. Given the lack of enforcement of the statute, the court is not persuaded, considering the balance of the hardships, that the issuance of the relief will injure the State's interests more than the State's own failure to enforce the statute.

More important, however, is the reality that the State has failed to enunciate a cognizable interest in the balance. Plaintiffs have demonstrated that they will be harmed in a material fashion and that the interest of the national economy will be adversely affected if this court fails to act. Plaintiffs have pointed out that the options available to them in selling their product both in-state and out-of-state will be adversely affected if the statute, as currently interpreted by the State, is allowed to stand. Plaintiffs have shown that they will suffer real hardships, while the State has made no showing of any hardship to which it will be subjected if the permanent injunction issues. At best, the State has made a thin showing that some of its dairymen will be affected. That showing is not enough to tilt the balance in favor of the State.

Based on the foregoing, the court concludes that the second factor of the *Dataphase* test, the balance of harm, weighs in favor of the grant of the requested relief.

## C. SUCCESS ON THE MERITS

### 1. The Commerce Clause

The Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state interests by burdening out of state competitors." *Wyoming v. Oklahoma,* 502 U.S. 437, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) *quoting New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The court uses a two tiered test to analyze state economic regulations and laws under the commerce clause. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986). If a state statute directly regulates or discriminates against interstate commerce or its effect is to favor in-state interests over out-of-state interests, it is "per se invalid" under the Commerce Clause and will be struck down, *Brown–Forman* at 579, 106 S.Ct. at 2084, and the burden falls upon the state to justify the economic regulation in terms of its benefits to the state and the lack of non-discriminatory alternatives that will accomplish the same goals. *Wyoming,* 502 U.S. 437, 112 S.Ct. at 801 (citation omitted). When, as here, the statute has only indirect effects on interstate commerce and regulates evenhandedly, the court must examine whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefit. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The critical consideration under either tier of the analysis is the overall effect of the regulation on both local and interstate activity. *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. at 2084.

In order to determine whether or not there is an impermissible conflict between Minn.Stat. §§ 32.11 and 32.25 and the Commerce Clause, the court must balance the local benefits of the statute against the burden it places on interstate commerce. *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). With this in mind, the court turns to an examination of the interests of the State and the benefits to be derived from the State's prohibition of volume premiums.

The State has set out as its primary interest in defending its interpretation of Minn. Stat. §§ 32.11 and 32.25 to prohibit volume premiums is the protection of its dairy industry. It has not, however, demonstrated that such prohibition of volume premiums will result in any local benefits to the state.

As stated earlier, the State asserts that its prohibition against the payment of volume premiums protects smaller farmers by allowing them to accurately compare price offers received from processors and by protecting them from having to finance the payment of volume premiums paid to large producers. (Affidavits of David Kaseno, William Coleman and Cook.) The State's argument ultimately posits that there is a finite amount of money available for the purchase of milk from Minnesota milk producers and that the money that is used for the payment of volume premiums is derived from that single fixed amount. Out of that fixed fund, however, also comes the purchase price of the milk produced by the State's smaller farmers. By prohibiting the payment of volume premiums, the State asserts that it is protecting its smaller dairymen because the finite sums of money with which producers purchase milk is more widely spread among the State's distressed dairymen. In other words, there is an economic pie of limited size and the State seeks to assure that all of its dairy farmers share access to the pie. By banning volume premiums, the State asserts, it insures that even the smallest and least productive dairy farms share equally, on a pro rata basis, with the largest and/or most productive dairy farm.

Plaintiffs respond that this argument is simplistic and misleading. Plaintiffs state the actual effect of volume premiums is to increase the total dollars available, because of increased milk output and lower costs to processors.

In the alternative, the State asserts that its ban on volume premiums protects its small dairy farmers by prohibiting predatory pricing. Interestingly, the State relies on *Fairmont Creamery* for its statement of the significant and important interests:

> A centralized creamery, supplied with ample capital and facilities, has the ability and meets the temptation to destroy competition at a buying station by overbidding, absorbing the resultant losses, if any, through the profits of its general business and, when competition is ended, to buy on a noncompetitive basis. If it does all this successfully, it has a monopoly, and may or may not treat producers justly. The statute seeks to prevent the destruction of competition by forbidding overbidding unless the dealer makes prices at other buying points correspond after proper allowances for the cost of transportation.

*Fairmont Creamery,* 274 U.S. at 7, 47 S.Ct. at 507. The State's reliance on this statement as a significant interest is misplaced. Not only was this rationale rejected in *Fairmont Creamery,* the State has simply produced no evidence that predatory pricing is anywhere involved in the development or continuing vitality of volume premium programs. The mere possibility that predatory pricing would result is insufficient, in this court's analysis, to avoid a finding of unconstitutionality. Moreover, the State has failed to show that its interest in deterring predatory pricing practices inures to the benefit of Minnesota dairy farmers. The State's interest in avoiding monopolies does not translate into a benefit simply because the State asserts that it is so.

The court has found that many other states that have enacted statutes which are directed at the evil sought to be remedied here.[6] Those statutes, however, contemplate something that this statute does not: a showing that the intent of the discriminatory pricing is to destroy competition. Indeed, the Court in *Fairmont Creamery* specifically objected to the lack of an intent requirement in the statute. 274 U.S. at 8, 47 S.Ct. at 507–08.[7] So broad an infringement on the right

6. See, e.g. IA.Stat. § 192A.4; WI Stat. § 100.201(b); Cal. Food and Agric. Code § 61382.

7. The requirement that the purpose of the discrimination be the destruction of competition or the creation of monopoly was removed from the statute in 1923. See, Laws of Minnesota, 1923, c. 120.

of persons engaged in commerce cannot be permitted, particularly where, as here, there is no relationship between the statute and the evil sought to be remedied.

The court, having examined the purported benefits of the legislation, now turns to an examination of the burdens plaintiffs argue are imposed on interstate commerce. First of all, the State concedes it cannot enforce the prohibition of volume premiums beyond Minnesota's borders. Plaintiffs argue that the State has nonetheless threatened to impose conditions on exports of milk outside of Minnesota which constitutes an impermissible burden on interstate commerce. The State has suggested that Minnesota dairy farmers may export their milk to obtain volume premiums as long as they use their own trucks and all aspects of the transaction takes place outside of Minnesota. Plaintiffs have provided affidavits of farmers who state such conditions place a substantial burden on them, especially smaller farmers.

The State argues the statute regulates evenhandedly and its effect on interstate commerce is minimal. The State asserts the statute simply prohibits out-of-state purchasers from paying volume premiums; "... the only effect upon out-of-state processors is that they may pay *less* for the milk which they purchase. There is no special burden placed upon them. That is all that the commerce clause requires." Deft.'s Mem. in Opp. to Plaintiff's Motion for Preliminary Injunction at 10. (Emphasis in original.) The overall teaching of the cases addressing this issue, however, is that a state "may not attach restrictions to exports or imports in order to control commerce in other states." *C & A Carbone, Inc. v. Town of Clarkstown,* — U.S. —, —, 114 S.Ct. 1677, 1683, 128 L.Ed.2d 399 (1994) (citing *Baldwin v. GAF Seelig,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935)).

Plaintiffs also argue that the volume premium prohibition to wholly in-state transactions will nonetheless have the impermissible effect of projecting Minnesota's regulations and prices scales into other states. *See, Healy v. Beer Institute,* 491 U.S. 324, 336, 109 S.Ct. 2491, 2499, 105 L.Ed.2d 275 (1989). Through operation of the Agricultural Adjustment Act of 1933, 7 U.S.C. § 608c(5), the Department of Agriculture issues marketing orders which set the prices to be paid for dairy products in forty eight states. The prices to be paid are determined by reference to the "average price per hundred weight for manufacturing grade milk, f.o.b. plants in *Minnesota and Wisconsin,* as reported to the Department [of Agriculture] for the month ...". *See, e.g.,* 7 C.F.R. §§ 1002.51, 1068.51 and *Minnesota Milk Producers Association v. Yeutter,* 851 F.Supp. 1389, 1391–92 (D.Minn.1994). (Emphasis supplied.) This pricing system is known as the M–W price series.

Plaintiffs argue that the prohibition of volume premiums has an affect on the M–W price series and, therefore, affects interstate commerce. Plaintiffs have submitted evidence that volume premiums are incorporated in the M–W's calculation of the prices paid for milk in Minnesota and Wisconsin. Because those premiums are included in the prices set by the M–W price series, plaintiffs argue that their prohibition tends to be reflected nationally in lower base prices for milk in each of the states that are subject to pricing orders utilizing the M–W index. As evidence of the adverse impact of the ban on volume premiums, plaintiffs point to the strong upward trend in base prices paid for milk until May 1994, the time at which the State notified purchasers that it intended to enforce its interpretation of Minn.Stat. § 32.11. After the notification, base prices paid for milk declined, an event which plaintiffs attribute to the ban on volume premiums. Plaintiffs estimate that the national impact of Minnesota's determination that Minn.Stat. § 32.11 forbids the payment of volume premiums is at approximately 20 million dollars. (Second Reply Affidavit of Donald E. Adult at (cite)). This, then, is no small impact on the national economy.

While there is much to commend the interest of the State in saving its dairy farmers, the State has failed to produce any evidence that banning incentive payments based on the productivity of certain farmers materially assists other farmers to protect their farms. Essentially, the State has chosen a means which is wholly unrelated to either of the

stated purposes; if the benefits to be derived could be made apparent to the court, the result here might be different. The State's dairy industry, however, has been in decline for many years, primarily as a result of competitive pressures originating in states where larger herds and increasing production of those herds is the norm. That is the fundamental reality that Minnesota seeks to avoid by banning production incentive payments. The harsh economic reality is that those dairymen who are unwilling or incapable of competing in the national market, as the market for dairy products has increasingly become, will not survive. And it is that national market that the Commerce Clause seeks to protect.

Moreover, the State has produced no evidence that purchaser productivity incentives have led to predatory pricing on the part of purchasers. Indeed, given the remarkable amount of regulation to which the dairy industry is subject, it is doubtful that the fears of the State as to the creation of milk monopolies can be realized at this late date. Plaintiffs contend that volume premiums are not designed to destroy competing dairies. Rather, they encourage productivity in the industry and allow manufacturers of dairy products to cut their direct and ancillary costs. The result of that increased productivity and lower cost should translate into lower cost for consumers and increased competition between competing dairies. The court finds plaintiffs argument persuasive.

The net effect of sections 32.11 and 32.25, as interpreted by the state of Minnesota, is to require that out-of-state purchasers of Minnesota milk conform their purchasing practices to reflect Minnesota's pricing regulations; the impact of that conformity on out-of-state producers of dairy products constitutes a burden on interstate commerce.

Based on the foregoing, the issue becomes whether the degree of burden placed on interstate commerce is outweighed by the benefits derived by the state of Minnesota. Because the Minnesota law purports to regulate interstate commerce, plaintiffs have established success on the merits unless it can be shown that the law is justified "both in terms of the local benefits flowing from the statute and the unavailability of ... alternatives adequate to preserve the local interests at stake." *Wyoming,* 502 U.S. 437, 112 S.Ct. at 801 (citations omitted.)

The State has proffered several justifications for its scheme prohibiting price discrimination. The court, however, finds that the State has not met its burden of justifying the statute either by showing the benefits of the statute or by demonstrating that no less burdensome alternative exists. The court therefore finds that plaintiffs have demonstrated success on the merits of their claim that Minn.Stat. §§ 32.11 and 32.25, as interpreted by the State, is invalid under the Commerce Clause.

2. The Contracts Clause

■ Plaintiffs argue that *Fairmont Creamery* remains good law and that the statute there found unconstitutional remains so as the constitutional infirmities which caused the Court to strike the statute in 1927 remain. As previously stated, the predecessor statute to Minn.Stat. § 32.11 held violative of the Contract Clause in *Fairmont Creamery* has not been substantively amended since that decision was rendered. The statute was held unconstitutional because it operated irrespective of motive, and without substantial relation to the anticipated evil of predatory pricing. Nonetheless, the State argues Minn.Stat. § 32.11 does not violate the Contract Clause under current case law.

The United States Supreme Court has employed a three part test to evaluate whether a state statute violates the Contract Clause by substantially impairing a contractual relationship. *General Motors v. Romein,* ––– U.S. ––––, ––––, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992); *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978); *Energy Reserves Group v. Kansas Power & Light Co.,* 459 U.S. 400, 404, 103 S.Ct. 697, 700–01, 74 L.Ed.2d 569 (1983); *Burlington Northern Railroad Company v. Neb.,* 802 F.2d 994, 1006 (8th Cir.1986). The three part inquiry is 1) whether there is a contractual relationship; 2) whether the state statute impairs the contractual relationship; and 3) whether the impairment is substantial. *General Mo-*

*tors v. Romein,* —— U.S. at ———–——, 112 S.Ct. at 1109–10. In addition to the foregoing, it must also be understood that in determining the extent of the impairment, the extent of regulation to which the industry has historically been subjected must be considered. *Allied Structural Steel,* 438 U.S. at 242, n. 13, 98 S.Ct. at 2721, n. 13 (*citing Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792, 794–95, 84 L.Ed. 1061 (1940)).

The prohibition in the Contract Clause against the impairment of contracts is not to be given a literal reading. *W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 433, 54 S.Ct. 816, 818–19, 78 L.Ed. 1344 (1934). The absolute language of the prohibition must be read to accommodate the inherent police power of the state "to safeguard the vital interests of its people". *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434, 54 S.Ct. 231, 238–39, 78 L.Ed. 413 (1934). More recently, the Court has framed the limits imposed on a state within the contours of the Contract Clause as follows: "[l]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).

The State argues that this claim must fail as the plaintiffs cannot establish the existence of any legal contracts for the payment of volume premiums, because those types of contracts have always been illegal under Minn.Stat. §§ 32.11 and 32.25. This argument lacks merit for a number of reasons. This argument lacks merit for two reasons. First, volume premiums are not explicitly prohibited by section 32.11. Second, section 32.25 arguably allows for volume premiums. There is no support, either by case law or legislative history, for the State's argument that "other premiums" is limited to quality premiums.

The State also asserts that no contracts providing for volume premiums existed at the time of the State's March 1994 memorandum prohibiting such premiums. Plaintiffs have produced a number of such contracts, however.

The State argues the legislation at issue is supported by a "significant and legitimate purpose" and "the adjustment of the 'rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *In re Walker,* 959 F.2d 894, 899 (10th Cir. 1992) (*quoting Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 705, and *United States Trust,* 431 U.S. at 22, 97 S.Ct. at 1518). However, as discussed at length in the section addressing the Commerce Clause, the State has wholly failed to establish that the prohibition of volume premiums serves this asserted interest.

Finally, the State argues that the dairy industry is heavily regulated by both the federal and state governments, and that whatever impairment plaintiffs suffer as a result of the prohibition of volume premiums, is the cost of doing business. The State asserts that allowing plaintiffs to contract for volume premiums would vitiate the important regulatory power of the state. In support of this argument, the State relies upon *Energy Reserves, supra.* In that case, participants in the natural gas industry complained of the state's restrictions on their contracts. Noting the industry to be heavily regulated, the Court stated:

> Price regulation existed and was foreseeable as the type of law that would alter contract obligations.

*Id.* 459 U.S. at 416, 103 S.Ct. at 707. Based on this statement, the State argues that milk prices have always been regulated therefore, the minimal regulation placed upon them by Minn.Stat. 32.11 does not constitute a constitutional impairment of contract. While it is true that milk prices have been regulated in the past, it is not true that a prohibition on volume premiums was foreseeable. This is especially true given the fact that volume premiums have been utilized in Minnesota since 1966, and no action was taken to prohibit them until *1994.* Given the amount of money involved, and the reliance upon the volume premiums by plaintiffs, the prohibition of such premiums is not minimal.

Accordingly, Minn.Stat. §§ 32.11 and 32.25, as interpreted by the State to prohibit the payment of volume premiums, is violative of the Contract Clause of the United States Constitution.

D. PUBLIC INTEREST

It is plain that the State has an interest in protecting its endangered dairies and that end may be effected on a purely intrastate basis. The State's interest in insuring that out-of-state processors comply with its pricing scheme "is outweighed by the public's interest in ensuring that farmers are able to participate in unfettered interstate competition as guaranteed by the Commerce Clause." *Marigold Foods, Inc. v. Redalen,* 809 F.Supp. 714, 724–5 (D.Minn.1992). Moreover, "every consumer may look to the *free competition from every producing area in the nation to protect him from exploitation by any.*" *H.P. Hood & Sons v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949). The critical issue, then, is competition. Out-of-state processors of Minnesota milk must be free to organize their production without regard to Minnesota's idea of what constitutes a fair price.

Based on the foregoing, the court concludes that the plaintiffs have satisfied their burdens and injunctive relief is appropriate.

E. ELEVENTH AMENDMENT

The State argues that the Eleventh Amendment to the United States Constitution prohibits a federal court from granting injunctive relief against a state based upon violations of state law. This argument is based upon the United States Supreme Court in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The State's reliance on *Pennhurst* in this case is misplaced, however. While the general rule is that the Eleventh Amendment bars a suit against a state official when the "state is the real party in interest", the Court has recognized an exception. In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court held that a state official, whose duty it is enforce a state statute which violates the United States Constitution, may be enjoined by a federal court from enforcing such statute against persons affected thereby.

> If the act which the state [official] seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Ex Parte Young,* 209 U.S. at 159–160, 28 S.Ct. at 454. This exception is specifically recognized in *Pennhurst,* 465 U.S. at 102, 104 S.Ct. at 909.

In this case, plaintiffs are asking for an injunction to enjoin the Commissioner of the Department of Agriculture from interpreting Minn.Stat. §§ 32.11 and 32.25 to prohibit volume premiums on milk prices, and from enforcing such interpretation. Because this court has found such interpretation of the statute as violative of the United States Constitution, this court is not barred by the Eleventh Amendment from enjoining such enforcement.

III.

Finally, the plaintiffs seek an award for attorney fees, costs and disbursements pursuant to 42 U.S.C. §§ 1983 and 1988. The court finds that the circumstances of this case do not warrant such an award.

It is therefore considered, adjudged and declared, pursuant to 28 U.S.C. § 2201, that Minnesota Statute § 32.11 imposes an impermissible burden on the conduct of interstate commerce in violation of the Commerce Clause of the United States Constitution.

Accordingly, IT IS HEREBY ORDERED that the Minnesota Department of Agriculture, its agents, successors, employees and all persons acting in concert or cooperation with it or at its direction or any other person or organization shall:

1. Minnesota Statutes §§ 32.11 and 32.25, as interpreted and enforced by the Commissioner to prohibit payment of volume-based

premiums to Minnesota milk producers is contrary to the Commerce Clause, U.S. Const. Art. 1, § 8, cl. 3, and the Contract Clause, Art. 1, § 10, cl. 1.

2. Cease from enforcing or attempting to enforce Minnesota Statutes §§ 32.11 and 32.25 of the laws of the State of Minnesota (1993) and the rules and regulations promulgated thereunder to the extent that the statute purports to prohibit the purchasers of milk produced in the State of Minnesota from paying to the producers of such milk a premium price based on the volume of milk delivered to the purchaser.

3. Plaintiffs' motion for attorneys fees, costs and disbursements is denied.

THERE BEING NO JUST REASON FOR DELAY, LET JUDGMENT BE ENTERED ACCORDINGLY.